UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

DONNA FEHN,                                   :
                                              :           Via ECF
                          Plaintiff,          :
                                              :
            -against-                         :           07 CIV. 8321 (WCC)
                                              :
GROUP LONG TERM DISABILITY PLAN FOR :
EMPLOYEES OF JP MORGAN CHASE BANK, :
JP MORGAN CHASE BANK, as Plan                 :
Administrator, HARTFORD LIFE AND              :
ACCIDENT INSURANCE COMPANY, as                :
Administrator/Fiduciary of the Plan, KRISTA   :
DUDECK, Individually, DANIEL BERTA,           :
Individually, KARA MORETT, Individually, and  :
DESMOND "Doe," Individually,                  :
                                              :
                          Defendants.         :
-------------------------------------------------------------- :
                                              x

JPMORGAN CHASE'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR RECONSIDERATION

JPMORGAN CHASE LEGAL DEPARTMENT
Stacey L. Blecher, Esq.
Attorneys for Defendants
JPMorgan Chase Bank, N.A.
1 Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-3814
Stacey.L.Blecher@Chase.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    Via ECF
DONNA FEHN,

                                :

                 Plaintiff,                07 CIV. 8321 (WCC)

                                :

       -against-

                                :

GROUP LONG TERM DISABILITY PLAN FOR
EMPLOYEES OF JP MORGAN CHASE BANK, JP    :
MORGAN CHASE BANK, as Plan Administrator,
HARTFORD LIFE AND ACCIDENT INSURANCE    :
COMPANY, as Administrator/Fiduciary of the Plan,
KRISTA DUDECK, Individually, DANIEL BERTA,    :
Individually, KARA MORETT, Individually, and
DESMOND "Doe," Individually,               :

                                :

               Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## JPMORGAN CHASE'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

### PRELIMINARY STATEMENT

       Defendant JPMorgan Chase Bank, N.A. (named erroneously herein as JPMorgan Chase

Bank") ("JPMorgan Chase"), by its attorneys, the JPMorgan Chase Legal & Compliance

Department, respectfully submits this Memorandum of Law in support of its motion pursuant to

Federal Rule of Civil Procedure 59(e) and Local Rule 6.3 for reconsideration of a portion of the

Court's Opinion and Order dismissing JPMorgan Chase's Counterclaim dated June 30, 2008 (the

"Order"), which was filed in the Clerk's office on June 30, 2008. See Exhibit A to the

accompanying Affidavit of Stacey L. Blecher, duly sworn to on July 15, 2008 ("Blecher Aff.").

Plaintiff Donna Fehn ("Plaintiff") commenced this action by filing a complaint in the United States District Court for the Southern District of New York pursuant to the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. §§ 1104(a), 1132(a)(1)(B), (a)(3). Plaintiff alleges that Defendants JPMorgan Chase Long-Term Disability Plan (erroneously named herein as "Group Long Term Disability Plan for Employees of JPMorgan Chase Bank"), JPMorgan Chase (a wholly owned subsidiary of JPMorgan Chase & Co., Krista Dudek (erroneously named herein as "Krista Dudeck"), Kara Morett and Daniel Berta (collectively, "JPMorgan Chase Defendants") and Defendant Hartford Life and Accident Insurance Company ("Hartford") denied her benefits and breached their fiduciary duties in violation of ERISA.

JPMorgan Chase brought a Counterclaim against Plaintiff for recovery of money which Plaintiff was paid, but was not entitled to under the JPMorgan Chase Disability Leave policy, a copy of which is annexed to the Blecher Aff. as Exhibit B. Plaintiff, inter alia, moved to dismiss the Counterclaim brought against her pursuant to Fed. R. Civ. P. 12(b)(6) and the Court dismissed the Counterclaim, holding that JPMorgan Chase failed to state a claim under ERISA § 502(a)(3) because while JPMorgan Chase shows just grounds for recovering money for a benefit Plaintiff received, it cannot assert title or right to possession of particular property.

JPMorgan Chase respectfully requests that this Court reconsider whether there was an "equitable lien by agreement" between JPMorgan Chase and Plaintiff, which would not be dependent on the ability to trace particular funds. JPMorgan Chase submits that on its Motion for Reconsideration, this Court should restore Plaintiff's Counterclaim against Plaintiff.

## STATEMENT OF MATERIAL FACTS

Plaintiff was employed by JPMorgan Chase (and its predecessor entities) from July 24, 1978 through February 18, 2005. Complaint ¶¶ 11, 14; Affidavit of Deborah L. Silverman, sworn to on March 4, 2008 ("Silverman Aff."), ¶ 3. On or about October 17, 2005, Plaintiff received an offer of re-employment with JPMorgan Chase Bank, N.A. with an anticipated start date of October 31, 2005. Complaint ¶ 26; Silverman Aff; ¶ 4 and Ex. A. Plaintiff accepted the offer of re-employment on or about October 19, 2005. See Silverman Aff.., Ex. A.

On or about October 24, 2005, Plaintiff completed the JPMorgan Chase application, which subsequently was electronically preserved. Silverman Aff; ¶ 6 and Ex. B. Plaintiff expressly agreed that she was "subject to and [would] follow JPMorgan Chase policies and procedures, including, but not limited to, . . . JPMorgan Chase's Human Resources policies." See Silverman Aff.., Ex. B. Plaintiff commenced her re-employment with JPMorgan Chase on October 31, 2005 after an approximate eight (8) month break in employment. Complaint ¶ 33; Silverman Aff; ¶ 7.

At the time of Plaintiff's reemployment with JPMorgan Chase Bank, N.A., JPMorgan Chase maintained an HR Policy, "Introductory Period," that stated, in relevant part (emphasis added), that it "applies to all newly hired and re-employed individuals regardless of the length of the break in employment." Silverman Aff; ¶ 8 and Ex. C. JPMorgan Chase's Disability Leave Policy in effect ("Disability Leave Policy") in or around October and November 2005 stated, in relevant part (emphasis added), that "[i]f you are a rehired full-time or part-time salaried employee, please note that you must complete the Introductory Period following your rehire to be eligible for disability pay benefits, even if you have met the recognized service requirement." Silverman Aff; ¶ 9 and Ex. D.

Plaintiff commenced a leave of absence in early November 2005, a few days after she returned to JPMorgan Chase's employ and applied for short-term disability benefits under the Disability Leave Policy. Complaint ¶¶ 36-40; Silverman Aff; ¶ 10. JPMorgan Chase communicated information pertaining to Plaintiff's application for short-term disability benefits to its administrator, Hartford, but erroneously provided Plaintiff's original hire date of July 24, 1978, rather than her re-hire date of October 31, 2005. Silverman Aff; ¶ 11. JPMorgan Chase paid Plaintiff $33,749.51 in short-term disability benefits under Disability Leave Policy. Complaint ¶ 40; Silverman Aff; ¶ 12.

Under the Disability Leave Policy then in effect, Plaintiff had not completed her Introductory Period and was ineligible for disability pay benefits, however, she was entitled to statutory benefits of $170.00 per week (for a maximum of 26 weeks), which are paid to New York employees who are not eligible for disability benefits under the Disability Leave Policy. Silverman Aff; ¶ 13, Exs. C and D. Plaintiff should have been paid only $4,420, which reflects her entitlement to New York statutory benefits in accordance with the Disability Leave Policy. Silverman Aff; ¶ 14. Plaintiff was overpaid in the amount of $29,329.51, reflecting erroneous payment of salary continuation under the Disability Leave Policy. Silverman Aff; ¶ 15. The overpayment of $29,329.51 was paid out by the JPMorgan Chase "cost center" for Plaintiff's business unit (#5560). Silverman Aff; ¶ 16. The Disability Leave Policy then in effect provided for reimbursement in the event of an overpayment. Blecher Aff; Ex. B.

Plaintiff's employment was terminated effective November 14, 2006. Silverman Aff; ¶ 17.

## ARGUMENT

### I

## THIS COURT SHOULD RECONSIDER THAT PART OF
## ITS ORDER THAT DISMISSED JPMORGAN CHASE'S COUNTERCLAIM

The standards controlling a motion for reconsideration pursuant to Local Civil Rule 6.3 (formerly Local Civil Rule 3(j)) and a motion to amend a judgment pursuant to Federal Rule of Civil Procedure 59(e) are the same. See Schipper v. United States of Am., No. 94-CIV-4049 (CPS) 1996 WL 651082 (E.D.N.Y. Oct. 31, 1996) (a copy of which is annexed hereto); see also Ades v. Deloitte & Touche, 843 F. Supp. 888, 891 (S.D.N.Y. 1994). To be entitled to reconsideration of a motion, it must be shown that the "Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion." Schipper, 1996 WL 651082 * 3; Ades, 843 F. Supp. at 891.

### A.    JPMorgan Chase's Counterclaim Must Be Restored

ERISA Section 502(a)(3)(B) provides, in relevant part, that a fiduciary may bring a civil action "obtain other appropriate equitable relief . . . (ii) to enforce. . . the terms of the plan." JPMorgan Chase, as fiduciary (plan sponsor) of the Disability Leave Policy, has counterclaimed against Plaintiff for the return of money improperly paid to Plaintiff. While counsel for JPMorgan Chase did not expressly frame the counterclaim as an "equitable" action under Section 502(a)(3)(B), it is clearly one for restitution pursuant to the terms of the Disability Leave Policy. JPMorgan Chase. is not seeking money damages; rather, JPMorgan Chase is entitled to be made whole from the monetary loss that the erroneous payout to Plaintiff caused and is seeking the return of money improperly paid by the Disability Leave Policy to Plaintiff -- which constitutes restitution, an equitable remedy, not money damages.

The Disability Leave Policy then in effect provided for reimbursement in the event of an overpayment (see Exhibit B to the Blecher Aff.), similar to the plan at issue in the new 7th Circuit case of Gutta v. Standard Select Trust Ins. Plans, No. 06-3708 (BMM) 2008 WL 2521662 (7th Cir. June 26, 2008) (a copy of which is annexed hereto). The Standard plan provided that "If the beneficiary 'ha[s] been overpaid, Standard will notify [the beneficiary] of the amount of the overpayment' and the beneficiary 'must immediately reimburse Standard for the amount of the overpayment.'" Id., at *5. The Gutta Court found that there was an "equitable lien by agreement" between Standard and Gutta, and that the lien is not dependent on the ability to trace particular funds. Id. Accordingly, Standard was allowed to bring its counterclaim under Section 502(a)(3)(B) even if the benefits it paid Gutta were not specifically traceable to Gutta's current assets because of commingling or dissipation. Id.

The situation at hand also constitutes an equitable lien – one that is not dependent on the ability to trace particular funds. Cf. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 (2002) (equitable relief to impose a lien distinct from legal relief seeking to impose personal liability for conferred benefits). Indeed, this Court recognizes that if an overpayment is offset for Social Security disability benefits, the money is recoverable. See Fedderwitz v. Metro. Life Ins. Co's Disability Unit, No. 05 CV 10193 (BSJ) (HP), 2007 WL 2846365 (S.D.N.Y. Sept. 27, 2007) (a copy of which is annexed hereto) (summary judgment granted in favor of MetLife on counterclaim seeking recovery of overpayment of LTD benefits due to plaintiff's receipt of Social Security disability benefits because a special res was designated to a specific creditor). There is no distinction whatsoever between "improper" payments and "overpayment" payments. Recovery of either overpayment still constitutes an equitable lien and restitution is an equitable remedy, not money damages.

CONCLUSION

For the foregoing reasons, JPMorgan Chase respectfully requests that this Court reconsider that part of the Order that dismissed JPMorgan Chase's Counterclaim, and grant JPMorgan Chase such other and further relief as the Court deems appropriate.

Dated: July 15, 2008

JPMORGAN CHASE LEGAL &
COMPLIANCE DEPARTMENT


By: _____
Stacey L. Blecher, Esq.
Attorneys for JPMorgan Chase
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-3814
Stacey.L.Blecher@Chase.com

To:    **Sapir & Frumkin LLP**
William D. Frumkin, Esq.
Attorney(s) for Plaintiff
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366
WFrumkin@sapirfrumkin.com

**Sedgwick, Detert, Moran & Arnold LLP**
Michael H. Bernstein, Esq.
Attorney(s) for Defendant Hartford Life
  And Accident Insurance Company
125 Broad Street, 39th Floor
New York, New York 10004-2400
(212) 422-0202
Michael.Bernstein@sdma.com

**APPENDIX**

Westlaw.

Not Reported in F.Supp.                                                                                              Page 2
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
**(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))**

▷Schipper v. U.S.
E.D.N.Y.,1996.

United States District Court, E.D. New York.
Irene Sandra SCHIPPER etc., Plaintiff,
v.
UNITED STATES of America et ano., Defendants.
**No. CV-94-4049 (CPS).**

Oct. 31, 1996.

MEMORANDUM AND ORDER

SIFTON, Chief Judge.
*1 This is an action brought under 26 U.S.C. § 7431 of the Internal Revenue Code ("the Code") by plaintiff Andrea Schipper alleging wrongful disclosure of confidential tax return information. In an earlier decision, the claim was ordered dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. At the time, I concluded that resort to § 7431 was precluded with respect to collections actions. However, I invited additional argument on plaintiff's contention that § 7431 still applies to refund actions. Having examined this issue in the light of the parties' thorough discussion, I conclude that resort to section 7431 is not precluded with respect to refund actions. On reconsideration, the motion to dismiss is accordingly denied.

BACKGROUND

Familiarity with the facts of this case as detailed in this Court's September 5, 1995 Memorandum and Order is assumed, but a brief summary of the facts relevant to the instant motion follows. *See Schipper v. United States of America*, No. 94-CV-4049 (CPS) (E.D.N.Y. Sept. 5, 1995) (hereinafter, *Schipper I* ).

Plaintiff commenced this action in August 1994 against the United States seeking to enjoin the IRS from levying on her wages and seeking monetary damages. Along with the filing of the complaint, plaintiff secured a temporary restraining order which was withdrawn by stipulation dated September 26, 1994.

On April 21, 1986, the plaintiff received a tax refund for 9,340.08 for the tax year 1984. Plaintiff's complaint stems from the government's subsequent efforts to recover the refund from her.

In 1983, plaintiff married Dr. Harold Geliebter. Plaintiff and her husband opened a joint checking account at that time and made four estimated tax payments from that account for tax year 1984, for a total of $18,000. Plaintiff and Geliebter separated in 1985, and plaintiff filed a 1984 tax return on her own behalf in November 1985. She declared the amount of income she had earned during 1984 and a single exemption. She noted the tax withheld and the tax due on her income. In addition, she claimed one-half of the estimated tax payments made by the couple during 1984 as tax paid on her behalf. In December 1985, plaintiff received a notice that there were no estimated tax credits for her social security number. She alleges that "[s]ometime thereafter, a letter was written on Sandra's behalf requesting that one half of the estimated tax payments be credited to her." Complaint ¶ 18. In 1986, the IRS credited her with half of the 1984 payments, and issued a refund for $9,340.08.

Plaintiff and Geliebter executed a divorce agreement in 1987. In 1990, Geliebter contacted the IRS, attempting to recover the money paid to plaintiff. Later that year, on October 11, 1990, the IRS wrote a letter to plaintiff, stating that it had determined that its 1986 refund to her was in error and that the balance now due on her account was $14,829.47, including interest and penalties. In response to her inquiries, the IRS informed her that the money previously refunded to him had been applied erroneously to her account and was now transferred to her ex-husband's account, because he had provided proof of his entitlement to it. Through her accountant, plaintiff responded that the IRS' collection attempts were both procedurally barred because the IRS had failed to provide a notice of deficiency and time barred because the statute of limitations had expired.

*2 Despite plaintiff's protests, the IRS levied on plaintiff's bank account on February 7, 1992. Plaintiff met with the Problem Resolution Program of the IRS, and the levy was temporarily abated while the matter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 3
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))

was reviewed. In March, the IRS denied plaintiff's request for abatement and shortly thereafter levied against plaintiff's wages. Plaintiff found out about this levy not from the IRS, but from the payroll department at the hospital at which she worked. Plaintiff asserts that she suffered a loss of credibility and reputation at work and suffered mental anguish as a result of this levy. In June 1992, plaintiff contacted a senior agent at the IRS who released the levy, but she was later informed that the IRS would continue to pursue its claim against her.

In March 1994, the IRS sent plaintiff another notice of its intent to levy against her property. Through counsel, plaintiff informed the IRS yet again that it was procedurally barred from recovering her refund. In May, the IRS responded that it was not time barred because it viewed plaintiff as misrepresenting her entitlement to the refund. The IRS stated that "IRC 6532(b) allows the service five years from the date of the refund to notify [plaintiff] that the refund was issued in error." Five years is longer than the ordinary statute of limitations under 26 U.S.C. § 6532.FN1 At this point, the IRS claimed that $19,326.15 was due. In July, the IRS levied on plaintiff's security deposit held by her landlord. Plaintiff contends she faced eviction because of this step taken against her. The IRS again withdrew its levy.

> FN1. This statute provides that "[r]ecovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact."

Finally, on August 2, 1994, the IRS again levied on plaintiff's wages, and plaintiff again learned of this levy through her employer. According to her complaint, plaintiff's net monthly income was $2,325.92 and her expenses amount to $2,109.01; with a $390.04 levy in place, she was unable to meet her monthly expenses. Plaintiff subsequently filed this lawsuit and an accompanying motion for preliminary injunction to remove the lien against her wages.

On September 26, 1994, this Court signed an "Agreed Entry and Order," wherein the government acknowledged that it had "ceased all collection activity against the plaintiff with respect to the 1986 Refund," that "[t]he statute of limitations with respect to the recovery of the 1986 Refund has run" and acknowledging that all future collection activity with respect to that refund is barred. The IRS conceded that it had never assessed the amounts it attempted to collect and did not file a lawsuit seeking recovery of the claimed erroneous refund. In the Agreed Order the IRS further agreed to repay any money it had collected against that refund over the years, with interest, and to pay tax refunds due plaintiff from 1990 and 1993 taken under its various levies.

Following the IRS stipulation, the plaintiff withdrew most of her claims. In her remaining cause of action, she alleges that each of the wrongful levies constitutes a wrongful disclosure of her return information in violation of 26 U.S.C. § 7431 and 26 U.S.C. § 6103.FN2 See Second Amended Complaint, April 4, 1995. Plaintiff alleges that the disclosures were made knowingly and in bad faith.

> FN2. Sections 6103 and 7431 provide in relevant part:
>
> > § 6103. Confidentiality and disclosure of returns and return information
> >
> > (a) General Rule.-Returns and return information shall be confidential, and except as authorized by this title-
> >
> > (1) no officer or employee of the United States,....
> >
> > shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions or under the provisions of this section.
> >
> > ....
> >
> > (k) Disclosure of certain returns and return information for tax administration purposes.-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))

....

(6) Disclosure by internal revenue officers and employees for investigative purposes.-An internal revenue officer or employee may, in connection with official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that such disclosure is necessary in obtaining information which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.

26 U.S.C. § 6103. Section 7431 reads in relevant part:

§ 7431. Civil damages for unauthorized disclosure of return and return information

(a) In general.-

(1) Disclosure by employee of the United States.-If any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

....

(b) No liability for good faith but erroneous interpretation.-No liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103.

(c) Damages.-In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of

(1) the greater of-

(A) $1,000 for each act of unauthorized disclosure of a return or return information with respect to which such defendant is found liable, or

(B) the sum of-

(i) the actual damages sustained by the plaintiff as a result of such unauthorized disclosure, plus

(ii) in the case of a willful disclosure of a disclosure which is the result of gross negligence, punitive damages, plus

(2) the costs of the action.

*3 In *Schipper I,* I held that, although § 7431 once provided a remedy in cases such as the plaintiff's, that remedy was impliedly repealed by the exclusivity clause of § 7433; [FN3] thus, plaintiff's claim did not survive. *See Schipper I,* at *14. In its papers in opposition to the defendant's motion to dismiss, the defendant argued in passing that because a "refund is not a tax," § 7433 would not operate to preclude a suit for wrongful disclosures made during attempts to collect a refund allegedly improperly paid to a taxpayer. The plain language of the statute states that § 7433 applies to actions "in connection with any collection of Federal tax." 26 U.S.C. § 7433. Neither party discussed the implications of the plaintiff's argument, and in granting the motion to dismiss I invited submission of a more thorough consideration of the issue on a motion for reconsideration. *See Schipper I,* at *18-19. In the light of the parties' briefs on this issue, it now becomes clear that a narrow exception to this Court's finding of implied preemption must be made to permit prosecution of cases such as that at issue here.

FN3.Section 7433 provides in relevant part:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))

(a) In general.-If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the [I.R.S.] recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States. Except as provided in section 7432 [damages for failure to release lien], such civil action shall be the exclusive remedy for recovering damages resulting from such actions.

## DISCUSSION

Local Civil Rule 3(j) provides for reconsideration of motions involving "matters or controlling decisions which counsel believes the court has overlooked." The standard for granting a motion for reargument is strict "in order to dissuade repetitive arguments on issues that have already been considered fully by the Court." Caleb & Co. v. E.I. Du Pont De Nemours & Co., 624 F.Supp. 747, 748 (S.D.N.Y.1985). The standards controlling a motion for reargument pursuant to Local Rule 3(j) and a motion to amend the judgment pursuant to Fed.R.Civ.P. 59(e) are the same. Ades v. Deloitte & Touche, 843 F.Supp. 888, 891 (S.D.N.Y.1994); Lotze v. Hoke, 654 F.Supp. 605, 607 (E.D.N.Y.1987). Therefore, to be entitled to reconsideration of this Court's decision on defendants' motion to dismiss the complaint, the plaintiff must demonstrate that there has been an intervening change of the controlling law, that there is new evidence which bears upon the issues decided or that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion. See Ades, 843 F.Supp. at 891;McLaughlin v. State of New York, 784 F.Supp. 961, 965 (N.D.N.Y.1992).

The issues here are properly before the Court. The Court, concerned that it might otherwise overlook an argument not adequately briefed by the parties, invited a reconsideration motion. The defendant has not objected, and it is now apparent that a decisive legal issue was in fact overlooked in its prior decision.

The plaintiff argues that, although § 7431 has been

superseded by § 7433 with respect to collection actions, the statute only applies to actions involving the collection of taxes not tax refunds. Plaintiff relies primarily on O'Bryant v. United States, 49 F.3d 340 (7th Cir.1995) to argue that a " 'refund is not, properly speaking, a tax amount' [; thus,] the act of sending a refund cannot of itself revive or continue a preexisting tax liability." Id. at 345 (quoting Rodriguez v. United States, 629 F.Supp. 333, 344 (N.D.Ill.1986)). The plaintiff argues the reason the government is required to pursue refunds through an erroneous refund suit, see26 U.S.C. § 7405, is that "erroneous refunds and tax liabilities are simply not of the same ilk." Id. at 347.

*4 The defendant counters that § 7433 should still supersede § 7431 because the collection of an erroneous refund and the collection of a tax liability are, in application, indistinguishable. Both are the result of owing money to the IRS, and both can be accomplished through the same statutory assessment and deficiency procedures. Rodriguez, 629 F.Supp. at 343;O'Bryant v. United States, 839 F.Supp. 1321, 1326 (C.D.Ill.1993), aff'd49 F.3d 340 (7th Cir.1995). Because the statutes governing collection procedures make no distinction between refunds and taxes, the government argues no distinction should be drawn when trying to fashion an appropriate remedy for a wrongful collection action.

The government attempts to distinguish some of the cases relied upon by plaintiff by arguing that the opinions failed to distinguish between refunds and taxes with respect to the collection procedures that were utilized. See Marshall v. United States, 158 F.Supp. 793, 795 (E.D.Tex.1958) (suit to recover the erroneous refund merely demands repayment of money wrongfully paid out of public treasury); Rodriguez v. United States, 629 F.Supp. 333, 334 (N.D.Ill.1986) (refund does not extend an old liability but creates the potential for a new one). The defendant, however, ignores the fact that in a variety of contexts the distinction between collection of a tax and recovery of a refund makes a legal difference. In Marshall, the plaintiff declaring bankruptcy discharged the debt created by an erroneous refund but would not have discharged the debt had it been classified as a tax liability. Id. at 794. In Rodriguez, the court expressly noted that a refund is not a tax amount even though the government is empowered to recover refunds through the same procedures used to

Not Reported in F.Supp.                                                                                        Page 6
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))

collect tax liabilities. *Id.* at 343-44.

Although the Second Circuit has not addressed this issue, authority in other circuits supports the position that a refund is appropriately treated in a different fashion than a tax in a variety of legal contexts. *See Clark v. United States,* 63 F.3d 83 (1st Cir.1995); *O'Bryant v. United States,* 49 F.3d 340 (7th Cir.1995); *United States v. Wilkes,* 946 F.2d 1143 (5th Cir.1991); *see also Stanley v. United States,* No. 94-32T, 1996 WL 220876 (Cl.Ct. May 1, 1996) (discussing cases). When the "taxpayer makes payment on a tax assessment, the payment extinguishes the assessment to the extent of the payment, and subsequent payments [by the IRS to the taxpayer] do not revive the assessment." *Wilkes* 946 F.2d at 1150. The only options available for recovering the erroneous refund are a suit under 26 U.S.C. § 7405 or a new assessment with notice and demand, *see* 26 U.S.C. § 6303. *See O'Bryant, 49 F.3d at 342-43.* The IRS cannot, however, utilize summary collection procedures authorized by 26 U.S.C. § 6502 because the money is sought as a refund and is "not part of the taxpaying transaction." *Id.* at 346. Rather, the courts characterize the action to recover an erroneous refund as a suit essentially for restitution, that is, to recover for unjust enrichment. *Id.* at 346; *Clark,* 63 F.3d at 87; *United States v. Bell,* 818 F.Supp. 444, 448 (D.Mass.1993).

*5 The sum sought in this case most closely resembles the so-called "no rebate" refund referred to in the *O'Bryant* case, *supra.* In *O'Bryant,* the court examined the differences between rebate and nonrebate erroneous refunds. Rebate refunds are generated when the IRS recalculates a taxpayer's liability for a given year, e.g., because a taxpayer submits an amended return showing additional deductions. *O'Bryant, 49 F.3d at 342.* Nonrebate refunds are sent to the taxpayer not because the IRS determines that the tax paid is not owing but because of mistakes, typically clerical or computer errors. *Id.* Rebate refunds can be included in deficiency calculations pursuant to 26 U.S.C. § 6211, while nonrebate refunds cannot. *Id.* Thus, in certain situations an erroneous rebate refund may resemble the creation of a tax liability than would be the case with a nonrebate refund.[FN4]

> FN4. Although it was not obliged to decide the issue, the Seventh Circuit, in *O'Bryant,*

implied that in the case of an erroneous nonrebate refund the government might be limited to a suit in restitution under § 7405. *Id.* at 347. The court noted that generally § 7405 preserved alternative methods of collecting erroneous refunds, but the concept of nonrebate refunds was not articulated until some 16 years after the enactment of the statute. *Id.* In questioning whether administrative procedures should be available for the collection of erroneous nonrebate refunds, the court made clear its distaste for "mischaracteriz[ing] an erroneous refund as a tax liability." *Id.*

In the instant case, from the actions taken by the IRS, it can be inferred that the government believed that the plaintiff had been unjustly enriched or received a windfall. As noted in *Schipper I,* the IRS acknowledged that one reason it could not pursue the collection of the refund was its failure to notice a new assessment against the plaintiff, thus impliedly admitting that the original liability had been paid and the assessment extinguished. *See also* Pl.'s Mem. in Opp. Ex. B. (IRS letter dated August 30, 1994 to plaintiff's counsel admitting its failure to make an assessment). Instead, the IRS chose to treat its action as one seeking restitution. This is evidenced by its misplaced reliance on the statute of limitations governing a statutory restitution suit under § 7405.[FN5] From these facts as well as the caselaw, it is clear that the refund in this case must be treated as something other than a tax, and the IRS' attempts to collect it were directed not to the collection of a tax liability but to the collection of money wrongfully paid from the public treasury.

> FN5. The reliance was "misplaced" because, although the IRS relied on § 7405's statute of limitations, it never actually filed suit, a necessary precursor to attempting to collect.

In *Schipper I,* this Court noted that, in "addressing arguably inconsistent requirements of two statutes, the courts must give effect to both where possible." *In Re Colonial Realty Co.,* 980 F.2d 125, 132 (2d Cir.1992) (citation omitted). To the extent that the wrongful disclosures alleged under § 7431 occurred during the course of a failed collection of a refund and not the collection of a tax, 26 U.S.C. § 7433 does not foreclose plaintiff's cause of action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 7
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126
**(Cite as: Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.))**

Having determined that the plaintiff's section 7431 complaint is not foreclosed by section 7433, I turn to the question whether plaintiff has successfully stated a claim. In considering a motion for failure to state a claim upon which relief will be granted, the complaint will be construed in a light most favorable to the plaintiffs, and the Court accepts as true all facts alleged in the complaint. *See Scheur v. Rhodes,* 416 U.S. 232, 236 (1974). Dismissal is proper under Rule 12(b)(6) only if "it appears beyond doubt that plaintiff can prove no set of facts in support of [her] claim which would entitle her to relief." *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

*6 I will not revisit the analysis of the confluence of section 7431 and section 6103, the statute setting out the limits on confidentiality and disclosure. I previously concluded that defendant's liability under § 6103 hinges on the propriety of the levy or collection activity. *See Schipper I,* at *11 (citing *Rorex v. Traynor,* 771 F.2d 383, 386 (8th Cir.1985)). I rejected defendant's reliance on *Venen v. United States,* 38 F.3d 100 (3d Cir.1994). Because I now conclude that in this limited circumstance the § 7431 action does survive the exclusivity clause of § 7433, the disclosures made in the face of the IRS' efforts to recover a refund are actionable.

To prevail in a suit for wrongful disclosure, the plaintiff must show: (1) that the disclosure was unauthorized; (2) that the disclosure was made knowingly or by reason of negligence; and (3) that the disclosure was in violation of § 6103. *See Weiner v. Internal Revenue Service,* 789 F.Supp. 655, 656 (S.D.N.Y.1992) (citations omitted), *aff'd,* 986 F.2d 12 (2d Cir.1993). Defendant admitted in its stipulation discontinuing all prior collection activity and agreeing to desist from future activity that it has acted improperly with respect to its attempts to recover plaintiff's 1984 refund. Coupled with plaintiff's repeated attempts through counsel's letters, phone calls, and meetings with IRS agents to notify the defendant of its wrongful acts, plaintiff has clearly established a prima facie case of negligence or even gross negligence sufficient to survive a motion to dismiss the claim.

Accordingly, for the reasons stated above, upon reconsideration, defendant's motion to dismiss is denied. The Clerk is directed to vacate the Memorandum and Order of this Court dated September 5, 1995, and the judgment entered on September 18, 1995, in accordance with that decision and to mail a copy of the within to all parties.

SO ORDERED.

E.D.N.Y.,1996.
Schipper v. U.S.
Not Reported in F.Supp., 1996 WL 651082 (E.D.N.Y.), 80 A.F.T.R.2d 97-8264, 97-1 USTC P 50,126

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.3d ----                                                                Page 2
--- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.)))**

**H**Briefs and Other Related Documents
Gutta v. Standard Select Trust Ins. Plans
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
Gandhi GUTTA, Plaintiff-Appellant,
v.
STANDARD SELECT TRUST INSURANCE
PLANS, Defendants-Appellees.
No. 06-3708.

Argued Sept. 11, 2007.
Decided June 26, 2008.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No. 04
C 5988-Blanche M. Manning, Judge.

Mark D. Debofsky, Daley, Debofsky & Bryant,
Chicago, IL, for Plaintiff-Appellant.
W. Sebastian von Schleicher, Michael J. Smith,
Smith, von Schleicher & Associates, Chicago, IL, for
Defendants-Appellees.

Before RIPPLE, MANION, and WOOD, Circuit
Judges.

WOOD, Circuit Judge.
*1 Dr. Gandhi Gutta, a laparoscopic surgeon, suffers
from a variety of physical ailments. In August of
2000, he came to the conclusion that he could no
longer work in his chosen profession and filed for
disability benefits under a group policy with Standard
Select Trust Insurance Plans (Standard). Gutta
received disability benefits from Standard for two
years. At that point, in order to be eligible for
continuing benefits under the plan, he had to show
not just that he was unable to perform his own
occupation, but that he was unable to perform *any*
gainful occupation for which he is suited by
education and experience. Standard continued to pay
benefits to Gutta for a third year while it investigated
his eligibility under the latter, more stringent,
criterion. It ultimately decided that Gutta was
ineligible for continuing benefits because he was
capable of working as a Medical Director.

After exhausting his administrative appeals, Gutta
filed suit in district court and moved for summary
judgment. He first argued for a favorable standard of
review, claiming that the policy does not grant the
plan administrators enough discretion to warrant
deferential review, and so he was entitled to the *de
novo* standard. He further claimed that even using the
more deferential "arbitrary and capricious" standard,
the Plan's determination was unreasonable, and
therefore arbitrary and capricious.

Standard likewise moved for summary judgment on
Gutta's claim; it also filed a counterclaim for
restitution of $73,996.75, nearly all the disability
benefits that it had paid to Gutta. Standard took the
position that Gutta had not been entitled to that sum,
because its policy contains an offset provision for
benefits received from other group insurance plans.
Gutta acknowledged receiving benefits from another
plan, but he claimed that it was not a group plan and
therefore was not subject to the offset provision.

Finally, Gutta also asked the district court to enforce
what he claimed to be a binding settlement
agreement, but the court declined to do so, finding
that the parties did not reach a meeting of the minds.
The court granted summary judgment in Standard's
favor on Gutta's claim as well as on Standard's
counterclaim, and Gutta now appeals both adverse
decisions.

**I**

We provide here the facts pertinent to the questions
whether the district court was correct to apply the
deferential "arbitrary and capricious" standard of
review to Standard's decisions and whether it
correctly rejected Gutta's assertion that the parties
had concluded an enforceable settlement agreement.
The facts bearing on Gutta's medical conditions and
Standard's assessment of his eligibility for disability
benefits are thoroughly discussed in the district
court's opinion and need not be repeated here. See
*Gutta v. Standard Select Trust Ins.,* No. 04 C 5988,
2006 WL 2644955, at *1-12 (N.D.Ill. Sept.14, 2006).

Gutta's Group Policy with Standard contains a section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.))
**(Cite as: — F.3d ——, 2008 WL 2521662 (C.A.7 (Ill.)))**

Page 3

titled "ALLOCATION OF AUTHORITY," which reads as follows:

*2 Except for those functions which the Group Policy specifically reserves to the Policyowner or Employer, Standard has *full and exclusive authority to control and manage* the Group Policy, to administer claims, and to *interpret* the Group Policy and *resolve all questions arising in its administration, interpretation, and application.* Standard's authority includes, but is not limited to:

1. The right to *resolve* all matters when a review has been requested;

2. The right to *establish and enforce* rules and procedures for the administration of the Group Policy and any claim under it;

3. The *right to determine:*

   a. *Eligibility* for insurance;

   b. *Entitlement* to benefits;

   c. *Amount* of benefits payable;

   d. *Sufficiency and the amount of information* we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy *any decision Standard makes in the exercise of our authority is conclusive and binding.*

(Joint Apx., Ex. A, Group Policy, Amendment 8, p. 2) (emphasis added).

As is true in most litigation, from time to time as this case progressed there was some talk of settlement. Gutta focuses on an exchange of emails that took place on June 1, 2005, to support his claim that the parties reached an enforceable agreement. On that day, Standard sent Gutta an email stating:

Standard's position is that Dr. Gutta is indebted to it in the amount of $73,996.75, hence, Standard's Motion to File its Counterclaim. In other words,

Standard's "response" is that it declines Dr. Gutta's offer to settle for its payment to him of $25,000, but Standard would, at this time, entertain resolution of all disputes existing between it and Dr. Gutta on the basis of a "walk-away" whereby each party foregoes prosecution of any further claim against the other under the terms of the Policy and otherwise.

Gutta's lawyer sent an email in response stating, "Given the current posture of the case, your 'offer' is accepted." On June 5, 2005, Standard then submitted a draft settlement agreement containing additional terms, which Gutta refused to sign.

## II

On the cross-motions for summary judgment with respect to Gutta's claim, appellate review is *de novo. Sound of Music Co. v. 3M,* 477 F.3d 910, 914 (7th Cir.2007). Similarly, we review *de novo* the grant of summary judgment in favor of Standard on the counterclaim. Adjudication of these claims, however, was proper only if the parties did not have an enforceable settlement agreement.

A legally binding settlement agreement is a contract, and so it is governed by ordinary principles. Gutta relies on Illinois law to support his argument, without objection from Standard, and so we too will look to that body of substantive law. From a procedural standpoint, however, federal law governs whether a judge or jury resolves any disputed issues. *Mayer v. Gary Partners and Co.,* 29 F.3d 330, 332-33 (7th Cir.1994). When the basic facts are not in dispute, the question whether a contract has come into being is one of law. See *Echo, Inc. v. Whitson Co.,* 121 F.3d 1099, 1102 (7th Cir.1997). If there are disputed facts, FED.R.CIV.P. 56 governs the question whether summary adjudication is permissible or if a trial is necessary.

*3 In *Laserage Technology Corp. v. Laserage Labs.,* 972 F.2d 799 (7th Cir.1992), we reviewed the requirements that Illinois imposes on contract formation in a situation similar to the one we face here:

A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applicable to contracts generally. Here, we look to Illinois contract law for guidance. In interpreting a contract under Illinois law, "the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement."...Illinois follows the objective theory of intent. As a result, whether [the parties] had a "meeting of the minds" as to security for the purchase of Mr. Byrum's Laserage shares is determined by reference to what the parties expressed to each other in their writings, not by their actual mental processes.

*Id.* at 802 (citations omitted). If a potential jury could reach only one conclusion about the existence of a meeting of the minds between Gutta and Standard, then the district court had no reason to explore the issue further.

The district court found that the statement in the email that Standard "would 'entertain' the idea of a 'walkaway' type of settlement [was] not a binding agreement to enter into a settlement agreement containing no terms other than a mutual promise for the parties to dismiss their respective complaint and counterclaim."The court interpreted the statement to mean "precisely what it says it is: an agreement to come to the table to talk about the parameters of an agreement which is premised on both sides walking away as opposed to one side paying the other side some amount of money."*Id.* It found no genuine dispute over the fact that there was "no meeting of the minds as to an agreement whereby the parties would, without more, dismiss their claims."*Id.*

Given the language in the email exchange and the fact that the draft settlement agreement of June 5 (an agreement Gutta rejected) contained three full pages of new terms, *id.* at 53-55, we too see nothing that might give rise to a material dispute of fact. There was no meeting of the minds here, and therefore no enforceable settlement contract came into being. We may thus proceed to the review of the district court's rulings on the motions for summary judgment.

### III

On the merits, this case largely turns on whether the language of the Standard plan gives the administrator discretion in determining benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct.

948, 103 L.Ed.2d 80 (1989), held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."When discretionary power is conferred on the administrator, her decision is reviewed under the arbitrary and capricious standard, *id.* at 111, and the district court may consider only evidence that was before the administrator in deciding whether her decision passes muster. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 n. 1 (7th Cir.1996).

*4 The reservation of discretion must be communicated clearly in the language of the plan, but the plan need not use any particular magic words. See *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 331 (7th Cir.2000). Indeed, "the critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to *shape the application, interpretation, and content of the rules in each case.*"*Diaz v. Prudential Ins. Co. of Am.,* 424 F.3d 635, 639 (7th Cir.2005) (emphasis added).

Although Standard's plan does not use the word "discretion," it uses a variety of equivalent terms that convey the same meaning. See *supra* ("full and exclusive authority to control and manage, ... to administer, ... and to interpret and to resolve all questions arising in its administration, interpretation, and application"; "[t]he right to determine [e]ligibility [and] entitlement"; "any decision Standard makes in the exercise of our authority is conclusive and binding"). This is a far cry from the spare language "when Prudential determines" and "satisfactory to Prudential" that this court found inadequate to signal discretion in *Diaz,* 424 F.3d at 638, 640. The Standard plan's language unambiguously communicates the message that payment of benefits is subject to Standard's discretion. Gutta argues unconvincingly that the language "Standard has authority ..." does not confer discretion but instead merely establishes that Standard operates the plan rather than some other actor. But that is not the only language in the Plan. Reading it as a whole, as we must, we conclude that Standard's plan "gives the employee adequate notice"

--- F.3d ----
--- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.)))**

Page 5

that Standard has the "latitude to shape the application, interpretation, and content of the rules in each case."See *id. at 639-40.*Thus, we will review Standard's determination deferentially, to ensure that the ultimate decision was not arbitrary, and we will not consider evidence outside the record that was before the administrator.

The district court exhaustively reviewed the medical evidence that was before the administrator. It summarized the testimony of no less than twelve doctors, as well as a few other people. Gutta had been diagnosed with the following conditions: type I diabetes, macular degeneration, retina artery aneurism in the left eye with a residual blind spot, dislocation of the left thumb, degenerative arthritis in both wrists, ulnar palsy of the left arms and hand, rotator cuff injury in the left shoulder, and degenerative arthritis in the right AC joint. Standard accepted the fact these problems left Gutta unable to continue working as a surgeon, but it found that he had never offered persuasive evidence showing that he could not perform other activities in the medical field. Standard took note of the fact that a number of experts believed that Gutta was capable of performing full-time sedentary to light-level work. It also observed that he had 10 1/2 years' experience in administrative positions, that he had owned and operated a medical practice for over 20 years, and that he had some administrative experience in hospitals. All this added up, in its view, to the conclusion that Gutta had the essential skills to become a medical director or assistant medical director.

*5 Gutta attacks these findings, and it is possible that we might have found more to criticize if we were conducting *de novo* review. But we are not. The district court, we conclude, reasonably concluded that Standard's decision was "based upon substantial evidence because it is consistent with the medical evidence in the record" and "thus easily satisfies the 'arbitrary and capricious' standard of review."See *Gutta v. Standard Select Trust Ins., 2006 WL 2644955, at *23.*

## IV

Turning to Standard's counterclaim, we must begin with the threshold question whether the district court had jurisdiction over it. ERISA preempts state-law

theories of recovery. *Leipzig v. AIG Life Ins. Co., 362 F.3d 406, 410 (7th Cir.2004).* If Standard's counterclaim can properly be viewed as seeking "equitable relief" under 29 U.S.C. § 1132(a)(3), then jurisdiction is secure, because in that case it would arise under ERISA and would fall within federal question jurisdiction. Gutta, however, argues that because the benefits Standard paid him have been commingled with his other assets or dissipated, tracing is impossible, and thus equitable relief is unavailable. This means, in his view, that the counterclaim in substance is now just a state-law claim for damages, outside the scope of ERISA.

The case of *Sereboff v. Mid Atl. Med. Servs., 547 U.S. 356, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006)*, controls our analysis. Marlene Sereboff and her husband were injured in a car accident, and her employer paid their medical expenses pursuant to an ERISA plan. *Id. at 1872.*The plan contained an " 'Act of Third Parties' " provision, which "require[d] a beneficiary who 'receives benefits' under the plan for such injuries to 'reimburse [Mid Atlantic]' for those benefits from '[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise).' " *Id.*(altered by the Court). The Sereboffs did in fact recover tort damages from a third party, and Mid Atlantic pursued reimbursement of the benefits it paid the Sereboffs, bringing an action under 29 U.S.C. § 1132(a)(3).*Id.* at 1873.The question before the Court was whether the relief Mid Atlantic sought was truly "equitable" for purposes of § 1132(a)(3). The Court held that it was and that the reimbursement provision in the plan created an "equitable lien by agreement." *Id.* at 1877.For the latter kind of lien (in contrast to "an equitable lien sought as a matter of restitution"), strict tracing of the funds to be recovered was not required. *Id.* at 1875.The Court noted also that "the fund over which a lien is asserted need not be in existence when the contract containing the lien provision is executed." *Id.* at 1876.

In our case, Standard's plan provides for an offset for "Income From Other Sources": "Each month your Maximum LTD [Long Term Disability] Benefit will be reduced by the Income From Other Sources for the same monthly period...." As the parties note, the relevant part of the definition of "Income From Other Sources" refers to "[t]he amount you receive or are eligible to receive because of your disability under any group insurance coverage, other than group

credit insurance or group mortgage disability insurance."

**\*6** The plan further provides that the beneficiary "must notify Standard of the amount of the Income From Other Sources when it is approved."If the beneficiary "ha[s] been overpaid, Standard will notify [the beneficiary] of the amount of the overpayment" and the beneficiary "must immediately reimburse Standard for the amount of the overpayment."

Standard's reimbursement provision is indistinguishable from the reimbursement provision in *Sereboff*, 126 S.Ct. at 1872. Here, too, there is an "equitable lien by agreement" between Standard and Gutta, and that lien is not dependent on the ability to trace particular funds. Standard may bring its counterclaim under 29 U.S.C. § 1132(a)(3) even if the benefits it paid Gutta are not specifically traceable to Gutta's current assets because of commingling or dissipation.

Even if all this is correct, Gutta maintains that he ought to prevail based on several defenses to the counterclaim. First, he claims that because he disclosed to Standard that he was receiving benefits from a policy that he obtained through his membership in the American Medical Association (AMA) with Sentry Life Insurance Company, the benefits paid by Standard were "voluntary payments" made "with full knowledge of the facts."The district court found, to the contrary, that the "record does not show that Standard Select knew that the AMA plan *was group insurance* and voluntarily chose to pay benefits."*Gutta v. Standard Select Trust Ins.*, 2006 WL 2644955, at \*27 (emphasis added). On appeal, Gutta does not contest this finding. Instead, he argues that Standard's ignorance is irrelevant, because the burden was on Standard to investigate further.

Aside from a number of policy arguments one could make against it, Gutta's position is contrary to the plain language of the plan, which states that "[Gutta] must notify Standard of the amount of the Income From Other Sources when it is approved."That can mean only that a proper disclosure would also disclose that a given payment was indeed from a group plan, *i.e.*, that it was Income From Other Sources. Otherwise, Gutta could disclose to Standard that he got a check from his grandmother and it would be up to Standard to investigate whether his

grandmother was an administrator of a group insurance plan, or an agent of any one of the many payors who might trigger an offset. Thus, the benefits paid by Standard could not properly have been characterized as voluntary.

Gutta's second defense is that because Standard did not exhaust administrative procedures before filing a counterclaim against Gutta, Gutta was denied a full and fair review. Standard's failure to exhaust, according to Gutta, also had the effect of impeding his discovery on the counterclaim. As Standard points out and as the record reflects, however, the district court specifically noted that it was denying discovery only with respect to the original claim and not the counterclaim. The rest of Gutta's discussion on this point revolves around the policy favoring exhaustion.

**\*7** We need not decide whether the same exhaustion requirement that applies to beneficiaries also applies to ERISA fiduciaries. See generally *Reliance Standard Life Ins. Co. v. Smith*, No. 3:05-CV-467, 2006 WL 2993054, at \*3 (E.D.Tenn. Oct.18, 2006) (holding that an ERISA fiduciary is not required to exhaust administrative review before bringing an action to recover an overpayment). Enforcement of an exhaustion requirement is left to the discretion of the district court. *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 401 (7th Cir.1996). The district court adjudicated the counterclaim despite Standard's failure to exhaust administrative review, and Gutta has not shown that this was an abuse of discretion.

Gutta's final argument is that the disability payments he received from his AMA policy are not subject to Standard's offset provision because the AMA policy is not "group insurance coverage." In his view, the AMA policy is better characterized as franchise insurance. "Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies."*Hall v. Life Ins. Co. of North America*, 317 F.3d 773, 775 (7th Cir.2003). Our own review of the AMA insurance certificate leaves us confident that Gutta's AMA insurance coverage was not an individual policy. The policy was issued to the AMA (the "Holder") under Group Policy No. 90-10613-47. Part V of the certificate contains a "Conversion Privilege," which shows that the AMA policy Gutta possessed was not an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.)))**

individual plan, but merely convertible to an individual plan upon the occurrence of certain events. After examining the various indicia of group policies found in the AMA Certificate, the district court found that the AMA policy was a group policy rather than a franchise policy, and that it therefore fell within the offset provision. After doing likewise, we agree.

* * *

The judgment of the district court is AFFIRMED.

C.A.7 (Ill.),2008.
Gutta v. Standard Select Trust Ins. Plans
--- F.3d ----, 2008 WL 2521662 (C.A.7 (Ill.))

Briefs and Other Related Documents (Back to top)

• 2007 WL 1511705 (Appellate Brief) Reply Brief of Plaintiff-Appellant (May 10, 2007)
• 2007 WL 3388288 (Appellate Brief) Brief and Appendix for Plaintiff-Appellant (Jan. 31, 2007)
• 06-3708 (Docket) (Oct. 10, 2006)
• 2006 WL 4482037 (Appellate Brief) Brief of the Defendant / Counter-Plaintiff Standard Select Trust Insurance Plans (2006)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                      Page 2
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
**(Cite as: 2007 WL 2846365 (S.D.N.Y.))**

**C**Fedderwitz v. Metropolitan Life Ins. Co. Inc.'s
Disability Unit
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Ronald FEDDERWITZ, Plaintiff, Counterclaim-
Defendant,
v.
METROPOLITAN LIFE INSURANCE COMPANY
INC.'S DISABILITY UNIT, as Claims
Administrator, Philips Electronics North America
Corporation Group Welfare Benefit Plan, and Erisa
Administration Committee, as Plan Administrator,
Defendants, Counterclaim-Plaintiffs.
**No. 05 CV 10193(BSJ)(HP).**

Sept. 27, 2007.

### MEMORANDUM & ORDER

BARBARA S. JONES, United States District Judge.
*1    Plaintiff-Counterclaim-Defendant    Ronald
Fedderwitz ("Fedderwitz") brought this action
against Metropolitan Life Insurance Company
("MetLife") (sued herein incorrectly as "Metropolitan
Life Insurance Company Inc.'s Disability Unit"),
Philips Electronics North America Corporation
("Philips") Group Welfare Benefit Plan, and ERISA
Administration Committee, as Plan Administrator,
alleging that defendants wrongfully denied him long-
term disability ("LTD") benefits in violation of the
Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. § 1001 et seq. Defendants
counterclaimed, seeking the repayment of an alleged
overpayment of benefits resulting from Fedderwitz's
receipt of Social Security Disability Insurance
("SSDI") attributable to the same period for which he
received LTD benefit payments. Pending before the
Court are cross-motions for summary judgment. For
the following reasons, defendants-counterclaimants'
motion is GRANTED, Fedderwitz's motion is
DENIED, and Fedderwitz's complaint is
DISMISSED.

### I. BACKGROUND

The following facts are undisputed, except where

otherwise noted.

From October, 1989 through February 10, 2003,
Fedderwitz worked for Philips as a "Senior
Electronic Technician," whose job responsibilities
included, among other things,[FN1] "covering job si[tes]
in: N.Y.C., upstate N.Y., parts of Long Island &
Connecticut[,][d]ismantling [n]uclear cameras for
repairs, maintenance, relocation & handling parts up
to and including 300 lb. lead plates."(Long Term
Disability Claim Form of Ronald Fedderwitz dated
Sept. 2, 2003 ("Fedderwitz LTD Claim Form").)

> FN1. The parties dispute Fedderwitz's title
> and the precise scope of his job duties. *See,
> e.g.,* Pl.'s Local Rule 56.1 Statement ¶¶ 24-
> 25; Defs.' Response to Pl.'s Local Rule 56.1
> Statement ¶¶ 24-25.

As a regular, full-time employee, Fedderwitz was
covered by Philips's Long Term Disability Program
(the "Plan"); MetLife serves as both the Plan's insurer
and claims administrator. The Summary Plan
Description ("SPD") provides the following
definition of "disability" pertinent to this action:

For the first 2 1/2 years, you will be considered
disabled if you are unable to earn more than 80% of
your indexed pre-disability earnings at your own
occupation for any employer in your local economy.
After 2 1/2 years, you will be considered disabled if
you are unable to earn more than 65% of your
indexed pre-disability earnings from any employer, at
any occupation for which you are reasonably
qualified, taking into account your training,
education, experience and pre-disability earnings.

(SPD at 8.) Any LTD benefits disbursed upon a
finding of disability were to "be reduced by the
amount [the claimant is] entitled to receive from
Social Security whether or not [the claimant is]
receiving benefits."(*Id.* at 13.)Further, the SPD
provides that "[i]f [the claimant's] application to
Social Security is pending when [he] begin[s]
receiving benefits under the plan, [the claimant] must
sign a reimbursement agreement with the plan so that
an estimate of the amount [the claimant] will be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

receiving from Social Security is not deducted from [the claimant's] plan payments."(*Id.*)

**\*2** With respect to the disability determination and Plan interpretation, the Plan grants MetLife

the exclusive right, power, and authority in its sole and absolute discretion to administer, apply and interpret the plan and any other plan documents, and to determine eligibility for and entitlement to plan benefits and to decide all matters arising in connection with the operation or administration of the plan.

(*Id.* at 15.)To determine whether a claimant is disabled under the Plan, "MetLife must have satisfactory evidence that [the claimant is] totally disabled."(*Id.* at 7.)

On February 11, 2003, Fedderwitz underwent surgery to replace his right knee, which was afflicted with osteoarthritis and atrophied due to injuries suffered as a child. (*See* Fedderwitz LTD Claim Form at 1; Fedderwitz Attending Physician Statement dated Sept. 12, 2003 ("Fedderwitz First APS"), at 1.) Following his surgery, Fedderwitz timely filed for Short Term Disability benefits, and received benefits for the full period of his eligibility, February 10, 2003 through August 10, 2003. (Pl.'s Local Rule 56.1 Statement ¶ 41.) He also timely filed for LTD benefits on or about September 2, 2003.(*Id.* 142.)

In his initial claim, Fedderwitz stated that the replacement of his right knee "prevent[ed him] from performing the duties of [his] job," and noted that the surgery affected his ability to "stand[ ], walk[ ], stoop[ ], [and] lift [ ]." (Fedderwitz LTD Claim Form Employee Statement.) As a part of his claim, Fedderwitz also provided MetLife with a list of all physicians who had treated him within the past two years, and a signed release authorizing the disclosure of medical information relevant to the disability claim. In a letter dated September 15, 2003, a case manager at MetLife informed Fedderwitz that "the information provided is insufficient to establish a total disability as defined by [the Plan]," and requested from Fedderwitz copies of office notes from all his treating physicians, as well as a completed Attending Physician Statement ("APS"). (Letter from Tina Conover, Case Management Specialist, to Ronald V. Fedderwitz, dated Sept. 15,

2003.)

Per MetLife's request, Fedderwitz submitted an APS (and accompanying report) from Dr. Richard Legouri, his orthopedic surgeon, as well as treatment notes from physical therapy sessions. Dr. Legouri asserted that Fedderwitz was "[t]otally disabled through reevaluation on 10/30/03," noting that Fedderwitz "lacks full range of motion, right knee. Limited standing/walking, no climbing, squatting or bending."(Fedderwitz First APS.) Assessing Fedderwitz's physical capabilities, Dr. Legouri stated that Fedderwitz was able to operate a motor vehicle, frequently lift or carry up to 20 pounds, and occasionally lift or carry up to 50 pounds. (*Id.*) The notes from a May 19, 2003 physical therapy session indicated that Fedderwitz "reports dull ache patellar region with knee extension but overall is pleased with his improved mobility and overall function."(Fedderwitz Physical Therapy Progress Report dated May 19, 2003.) According to these notes, Fedderwitz was also able to support his weight using only his right leg while on a trampoline for over 30 seconds, was "[i]ndependent without assistive device on all terrains with significant antalgia," and "made significant improvement in all parameters of therapy: [range of motion], strength, ambulatory status and function ."(*Id.*) A subsequent physical therapy progress report from August 16, 2003 repeated Fedderwitz's satisfaction with "his improved mobility and overall function."(Fedderwitz Physical Therapy Progress Report dated Aug. 16, 2003.) MetLife also requested and received from Philips what was later discovered to be an inaccurate statement of Fedderwitz's job description; [FN2] MetLife relied upon this description in making its initial determination regarding Fedderwitz's LTD claim.

> FN2. This job description was for a job that was largely sedentary and less physically demanding than Fedderwitz's job; MetLife ultimately received an accurate description.

**\*3** Based on the information provided, on or around September 25, 2003, MetLife approved LTD benefits through October 30, 2003. (Diary Review-Report for Ronald Fedderwitz at 5.) In early October, Fedderwitz signed and submitted an Agreement to Reimburse Overpayment of Long Term Disability Benefits; this Agreement required Fedderwitz to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

apply for SSDI benefits, to inform MetLife of any award, and to reimburse MetLife for the difference between MetLife's LTD benefit payment and any SSDI benefits he received. Additionally, in further support of Fedderwitz's claim, Dr. Legouri submitted another APS dated October 30, 2003, in which he noted that Fedderwitz still had trouble standing, walking, climbing, and squatting. (Fedderwitz Attending Physician Statement dated Oct. 30, 2003 ("Fedderwitz Second APS").) Dr. Legouri also submitted a copy of his treatment notes; an entry dated October 30, 2003 stated that "[Fedderwitz] is doing much better. He has approximately the same range of motion he had preoperatively except that he has less pain."

In a letter dated December 1, 2003, MetLife declined to extend Fedderwitz's LTD benefits beyond October 30, 2003. Citing the records submitted by Fedderwitz and referring to the erroneous job description, MetLife noted that

[t]he restrictions and limitations provided by Dr. Legouri on the Attending Physician Statement would not prevent you from working within your own job demands. The physical therapy notes show overall improvement in strength and range of motion. You are able to ambulate independently on all terrain without assistive devices. The October 30, 2003 office visit note indicates you are doing much better, you have less pain, and you were, to continue with activities as tolerated and follow-up in three months. You do not appear to be in the acute phase of recovery based upon the medical information submitted. There is no evidence that you have side effects from medication or that medications would prevent you from returning to work. There is no indication you require a referral to other specialists such as pain management or physical medicine and rehabilitation. As the medical information provided no longer supports a severity of your condition that would prevent you from working at your regular job, your claim for long-term disability benefits has been terminated effective October 31, 2003.

(Letter from Tina M. Conover, Case Management Specialist, to Ronald Fedderwitz, dated Dec. 1, 2003, at 2.) Within a few days, Fedderwitz's wife and a union representative telephoned MetLife to inform it that it had relied on an inaccurate job description in making its disability determination. (Pl.'s Local Rule

56.1 Statement ¶ 51; Diary Review-Report for Ronald Fedderwitz at 13.) MetLife confirmed the error, and received an accurate job description from Philips shortly thereafter. (Pl.'s Local Rule 56.1 Statement ¶ 56.)

After receiving this description, MetLife had Fedderwitz's file reviewed in light of the accurate job description by Dr. John Thomas, an independent physician. (Diary Review-Report for Ronald Fedderwitz at 15.) According to MetLife's internal documentation of this review, Dr. Thomas's impressions were that Fedderwitz "may never have had [a] normal [range of motion]" in his right leg due to the burns and scarring he had suffered as a child; Thomas also noted that Fedderwitz was "able to function in [his] job essential duties w/this condition prior to" the knee replacement surgery. (Id.) Additionally, Dr. Thomas remarked that

*4 notes show that [Fedderwitz] has improved condition compared w/pre-op. [Attending Physician] notes 10/30/03 [Fedderwitz] doing much better, ... has approx[imately] same [range of motion] as he had pre-op except that he has less pain .... [Fedderwitz] appears improved from pre-op ... able to function in own job duties.

Appears own job would allow [Fedderwitz] to change positions as needed, own job does not require constant kneeling, etc. that would not allow for change of positions.

(Id.) Thomas thus concluded that "medical does not appear to support that [Fedderwitz] unable to function in own occ[upational] duties past ... 10/30/03."(Id.)

Through a letter from his attorney dated February 4, 2004, Fedderwitz notified MetLife of his intent to appeal MetLife's determination, and requested a copy of his claim file; MetLife provided him with a copy of the file on or around February 18, 2004. By a letter dated July 7, 2004, Fedderwitz requested that MetLife "treat this letter and the enclosed medical documentation as Mr. Fedderwitz's appeal of Met[L]ife's decision to terminate his's [sic] long term disability benefits."(Letter from Patrick Busse, Binder & Binder, PC, to Thomas Balfe, Metropolitan Life Insurance Co., dated July 7, 2004, at 1.) Along with additional documentation from Dr. Legouri,

Slip Copy                                                                                                      Page 5
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

Fedderwitz supplemented his initial claim documents with letters and reports from Dr. Mitchell Saunders, his treating cardiologist; Dr. Lee Shangold, his otolaryngologist; Dr. Paul Bohensky, his pulmonologist; and Dr. Thomas Spinnato, his primary care physician. In this letter, Fedderwitz also noted that he "successfully obtained Social Security Disability based upon his various medical conditions."(*Id.* at 10.)

The evidence submitted for Fedderwitz's appeal included the following. In a letter dated March 18, 2004, Dr. Legouri wrote that Fedderwitz had recently suffered an injury to his left knee that might require surgery. However, Legouri also noted that Fedderwitz's right knee was "doing well," and that there was "no real pain throughout range of motion."(Letter from Richard A. Legouri, M.D., to Thomas Spinnato, M.D., dated March. 18, 2004, at 1.)

Dr. Saunders reported in a letter dated October 15, 2003, that Fedderwitz "[p]ostoperatively ... had trouble with respiratory problems and hypoventilation, possibly related to morphine [and] had incidences of night sweats, which seem to be resolving."(Letter from Mitchell A. Saunders, M.D., to Thomas Spinnato, M.D., dated Oct. 15, 2003 ("Saunders October Letter"), at 1.) The results of a June, 2003 echocardiogram were described as "reveal[ing] mildly dilated left atrium at 4.3 cm, mild pulmonary hypertension with an RVSP of 44mmHg, trace aortic insufficiency and mitral and tricuspid regurgitation."(*Id.*) Saunders further noted that "[Fedderwitz] states that he gets very physically exhausted with moderate activity. He cannot even raise his arms above his head without losing his breath and feeling fatigued very quickly."(*Id.* at 2.) After assessing Fedderwitz's other conditions and his medications, Dr. Saunders concluded that "[a]t this time, [Fedderwitz] does not appear to have the physical ability to return to work as a nuclear technician repairman."(*Id.*)

**\*5** Dr. Saunders wrote up the results of Fedderwitz's follow-up visit in a letter dated February 27, 2004. In this letter, Dr. Saunders noted that

[Fedderwitz] presents today for follow up evaluation and reports that overall he is feeling well from a cardiac standpoint. He also reports feeling significant improvement in his edema, weakness and fatigue since switching to atenolol. He does report, however, that he has been somewhat noncompliant with regard to his diet and has had elevated blood sugars and lipid levels. He denies any chest pain, exertional chest discomfort, shortness of breath, lightheadedness, dizziness, syncope, near syncope, palpitations, PND, orthopnea, or peripheral edema.

....

Physical examination reveals a well-developed, well-nourished male, alert and oriented, in no acute distress with good skin color and turgor. Cardiac examination reveals normal S1, S2 with no murmurs, rubs, gallops or clicks....

Resting electrocardiogram performed today demonstrates normal sinus rhythm, right bundle branch block pattern which is noted on prior tracings.

In summary, this is a 63-year-old male with a history of paroxysmal atrial fibrillation and hypertension which both appear to be well controlled on his current regimen of atenolol and Norvasc.

(Letter from Mitchell A. Saunders, M.D., to Thomas Spinnato, M.D., dated Feb. 27, 2004 ("Saunders February Letter"), at 1-2.) And in contrast to his earlier letter, here, Dr. Saunders made no assessment regarding Fedderwitz's disability status.

Fedderwitz's pulmonologist, Dr. Bohensky, submitted a letter dated November 18, 2003, in which he noted that he had been treating Fedderwitz for the past six years due to his chronic lung disease. As a result of this condition, Dr. Bohensky stated that "[Fedderwitz] becomes short of breath easily upon mild exertion.... [His] abnormality results in a predisposition to respiratory infections for which he needs recurrent treatment."(Letter from Paul Bohensky, M.D., to Charles E. Binder, Binder and Binder, dated Nov. 18, 2003.) Dr. Bohensky also noted that "Mr. Fedderwitz also has other multiple medical problems including diabetes, hypertension, asthma, atherosclerotic heart disease, status-post bypass surgery, seizure disorder, and status-post severe burns to his body."(*Id.*) He concluded by asserting that "Mr. Fedderwitz is significantly limited and is essentially disabled at this time. This is most likely permanent."(*Id.*)

Slip Copy
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

MetLife sent the complete file to another independent physician, Dr. John Olmstead, who conducted a review of the claim. In his report, Dr. Olmstead summarized the medical documentation in the file, along with impressions of some of the evidence provided. Dr. Olmstead assessed Fedderwitz's knee condition as follows:

In a disability note, Dr. Legouri describes him as totally disabled until 1/22/04 pending re-evaluation. This is inconsistent, and total disability because of the knee surgery, is not supported by objective medical information in the file. In fact, he describes his capabilities differently. In his [office visit notes], Dr. Legouri states [Fedderwitz] is doing much better, has [range of motion] nearly the same as preoperatively, with less pain. Activity is as tolerated. PT notes in the file support improving motility and as early as 5/18/03, the patient is able to stand on one leg on a trampoline for more than 30 seconds, and is ambulatory on any terrain without assistive devices.

*6 (Fedderwitz Physician Consultant Review at 4.) Dr. Olmstead then turned to Fedderwitz's physical restrictions in light of the job description, noting that [Fedderwitz] submits what is purported to be his correct job description and indeed, he does quite heavy work. He also must occasionally work in awkward positions as well as needing to be quite flexible. Work on ladders, or scaffolding would be inappropriate with his limitations. He has potential exposure to toxic fumes from which he needs to avoid exposure.

(*Id.*) Because of the potential exposure to fumes, Dr. Olmstead next considered Fedderwitz's respiratory condition:
The ability to wear a respirator in this regard is not addressed. He is described as having a chronic restrictive lung disease. There is no pulmonary function testing in the file. It is unclear from the record what may have changed from the time when he last worked that he now requires these restrictions. There is no documentation of ongoing medical severity, frequency, severity, and duration of symptoms despite treatment. He would be predisposed to respiratory infections whether he is at work or not, which does not support an impairment to his job.

(*Id.*) The report characterized the evidence regarding Fedderwitz's cardiac status as follows:
Dr[.] Saunders, cardiologist, feels the atrial fibrillation is well controlled with the current medications. His high blood pressure is likewise under good control. His blood sugars and lipids are not in good control and this is due to lack of patient compliance. Concerns about his previous [myocardial infarction] and by-pass grafts are not raised by the cardiologist. In the absence of any information to the contrary, the coronary status is presumed to be good and would not be an impairment to work. There is no record of a current treadmill test.

(*Id.*) Dr. Olmstead also considered the other medical conditions that Fedderwitz first brought up on his appeal, asserting that
[Fedderwitz's] age is not an impairment to work. The prior history of the 3rd degree burns is not impairment. He has been working his whole life with this, and there is no documentation supporting this as a disability. Diabetes and lipids have been out of control but latest labs show dramatic improvement, quite likely because claimant is currently paying attention to his diet. This is not an impairment to work. His thyroid disease has been controlled by surgery and medication and is not impairment.

(*Id.*) Dr. Olmstead distilled his concerns about the appeal as follows: "The question is whether this person can do the heavy work of a nuclear tech. The main difficulty with this file is an absence of objective medical documentation of a functional impairment to work due to respiratory, cardiac, or knee function."(*Id.*)

In a letter dated August 18, 2004, MetLife notified Fedderwitz that the decision to terminate benefits past October 30, 2003 was upheld on review, and provided as an explanation for its decision a condensed version of Dr. Olmstead's report. This action followed.

## II. DISCUSSION

### A. *Applicable Standards*

#### 1. *Summary Judgment Standard*

*7 Summary judgment may not be granted unless

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).* In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)*). Summary judgment is inappropriate if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994).* However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, (1986).*

*2. Standard of Review for a Denial of Benefits Under ERISA*

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."*Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir.1999)* (quoting *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)*)."Where a plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Kinstler, 181 F.3d at 249* (quoting *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir.1995)*) (citation and quotation omitted). "This scope of review is narrow, thus [the Court is] not free to substitute [its] own judgment for that of the [plan administrator] as if [the Court] were considering the issue of eligibility anew." *Pagan, 52 F.3d at 442.*

An allegation that the plan administrator operated under a conflict of interest is insufficient by itself to change the standard of review; rather, "[i]n order to trigger *de novo* review of an administrator's decision when the plan itself grants discretion to the administrator, a plaintiff must show that 'the administrator was *in fact* influenced by the conflict of interest .' " *Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92 (2d Cir.2000)* (quoting *Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1256 (2d Cir.1996)*) (emphasis in *Pulvers* ). "[T]he burden of proving that the conflict of interest affected the administrator's decision rests with the plaintiff[ ]." *Sullivan, 82 F.3d at 1259.* "The fact that [an entity] served as both plan administrator and plan insurer, although a factor to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review." *Pulvers, 210 F.3d at 92* (internal quotations and citation omitted).

*8 Here, the Plan language unmistakably grants MetLife discretionary authority to determine eligibility for benefits. Nevertheless, Fedderwitz contends that the Court should conduct a more stringent *de novo* review of the decision to deny LTD benefits because MetLife "operated under a conflict of interest."(Pl.'s Memorandum of Law in Support of His Motion for Summary Judgment and in Opposition to Def.'s Motion for Summary Judg[ ]ment ("Fedderwitz's Summary Judgment Memorandum"), at 10.) Fedderwitz's only support for this allegation is the conclusory assertion that "[t]here can be no other reason for Metlife's dogged pursual of Mr. Fedderwitz' termination in the face of such clear and convincing evidence of his disability, and also of Met [L]ife's error in using the wrong job description." (*Id.*) This assertion by itself is insufficient to alter the standard of review, and thus the Court will review the decision to deny Fedderwitz LTD benefits under the arbitrary and capricious standard.

*B. Review of the Decision to Deny LTD Benefits*

In this action, Fedderwitz claims that MetLife's decision to deny LTD benefits was arbitrary and capricious because MetLife "ignored reliable evidence of Mr. Fedderwitz's disability and, instead, relied upon inherently unreliable 'medical' evidence created by its own 'paid for' consultant"; "intentionally skewed the results of its internal medical and vocational reviews to support its

decision to deny benefits by ignoring the error in the job descriptions"; "improperly imposed additional substantive requirements on Mr. Fedderwitz which do not appear in the SPD or the group insurance policy" by discounting medical conclusions not supported by objective medical documentation; and "denied [Fedderwitz] a full and fair review by intentionally withholding the reviewing physicians' credentials and name[s] during the review process."(Fedderwitz's Summary Judgment Memorandum at 11.)

Contrary to Fedderwitz's claims, the record before this Court, even with all reasonable inferences drawn in Fedderwitz's favor, does not support the conclusion that MetLife's decision to deny LTD benefits was arbitrary and capricious. Indeed, Fedderwitz's characterization of MetLife's actions is not borne out by the record.

1. *Fedderwitz's Challenges to the Decision*

With respect to MetLife's consideration of Fedderwitz's medical documentation, it was not unreasonable or arbitrary and capricious for MetLife to discount the statements of Fedderwitz's treating physicians in light of the contradictory evidence presented by the reports. For example, although Dr. Legouri asserted in mid-September, 2003 that Fedderwitz was completely disabled, the doctor's treatment notes from October, 2003 noted that Fedderwitz "has approximately the same range of motion he had preoperatively *except that he has less pain.*"(Treatment Notes of Dr. Legouri (emphasis added).) Similarly, while Dr. Saunders concluded in October, 2003 that "[Fedderwitz] does not appear to have the physical ability to return to work as a nuclear technician repairman," (Saunders October Letter at 2), a subsequent letter presented a significantly improved cardiac status and was notably silent with respect to Fedderwitz's disability status, (*see* Saunders February Letter). The claim file shows that MetLife's reviewing physicians considered this evidence, along with other factors, in denying Fedderwitz's claim. This Court cannot say that this evidence-largely provided by Fedderwitz himself-is not substantial evidence in support of MetLife's decision.

*9 Fedderwitz emphasizes that MetLife should have accorded more weight to the opinions of his treating

physicians, arguing that "it was arbitrary and capricious for Met[L]ife to give greater and controlling weight to the opinions of its employees over that of Mr. Fedderwitz's treating, board certified orthopedic surgeons, board certified internists, board certified cardiologists, board certified pulmonologist, and his primary care physicianall of which [sic] have examined him countless times."(Fedderwitz's Summary Judgment Memorandum at 21.) However, as Fedderwitz acknowledges, "plan administrators are not obliged to accord special deference to the opinions of treating physicians."*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). Still, although plan administrators are not required to defer to treating physicians, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."*Id.* at 834.Here, the record shows that MetLife relied largely on what it found to be internal contradictions in Fedderwitz's own evidence in declining to credit the disability conclusions of Fedderwitz's treating physicians, and this Court cannot say that such refusal was arbitrary.

Additionally, Fedderwitz claims that MetLife's reviewers failed to adequately consider the cumulative impact of all of his medical conditions vis-a-vis his disability claim; again, the record shows otherwise. Dr. Olmstead expressly took into account Fedderwitz's numerous chronic conditions, most of which had manifested prior to Fedderwitz's asserted disability, noting that the medical evidence provided suggested that the conditions were under control, and that in some cases, Fedderwitz had been able to perform in his job despite them. (*See* Fedderwitz Physician Consultant Review at 4.) In light of these factors, it was not unreasonable for MetLife to decline to then consider the cumulative impact of Fedderwitz's chronic, mostly preexisting conditions in conjunction with his knee condition.

Fedderwitz also contends that MetLife's skepticism of some of Fedderwitz's physicians' subjective claims in the absence of objective medical documentation violated the terms of the Plan, by "essentially adding new terms to the LTD Plan," to wit, an objective evidence requirement. (Fedderwitz's Summary Judgment Memorandum at 22.) This argument is unavailing. First, the terms of the Plan expressly require "satisfactory evidence" of a disability; it is not an unreasonable interpretation of that provision to

Slip Copy                                                                                               Page 9
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

require objective medical evidence to support subjective claims. And as a general matter, courts in this Circuit have declined to find unreasonable a decision to favor objective over subjective medical evidence. *See, e.g., Graham v. First Reliance Standard Life Ins. Co., No. 04 Civ. 9797(NRB), 2007 WL 2192399, at \*9 (S.D.N.Y. July 31, 2007)* ("First Reliance's decision to credit objective over subjective evidence was not unreasonable or illegitimate."); *Couture v. ONUM Provident Corp., 315 F.Supp.2d 418, 432 (S.D.N.Y.2004)* ("It is not unreasonable for an insurer to credit objective evidence over subjective evidence.").

2. *Fedderwitz's "Full and Fair Review" Claim*

**\*10** Finally, Fedderwitz argues that he was denied a full and fair review as required by ERISA due to various alleged errors committed throughout the review process, including MetLife's reliance on an incorrect job description, a failure to provide Fedderwitz with the requested credentials of reviewing physicians, and other procedural errors. This argument is also unavailing.

Under ERISA, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."*29 U.S.C. § 1133(2).* Regulations issued by the Department of Labor further provide in pertinent part that

the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures ... [p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; ... [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits....; [and p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

*29 C.F.R. § 2560.503-1*(h)(2)(ii)-(iv). The purpose of this review is to "provide the member with information necessary for him or her to know what he or she must do to obtain the benefit.... [and to] enable the member effectively to protest that decision."*Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir.2000).* In essence, the full and fair review requirement exists "to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts."*Id.* (internal quotations omitted).

The Second Circuit has indicated that a full and fair review occurs where a plan administrator has substantially complied with ERISA's procedural requirements, *see Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 107 (2d Cir.2003)*, and district courts in this Circuit have adopted this standard, *see, e.g., Cook v. New York Times Co. Long-Term Disability Plan, No. 02 Civ. 9154(GEL), 2004 WL 203111, at \*6 (S.D.N.Y. Jan. 30 2004); Diagnostic Medical Associates, M.D., P.C. v. Guardian Life Ins. Co., 157 F.Supp.2d 292, 299 (S.D.N.Y.2001).*"The more flexible application of these regulatory requirements does not indicate that courts do not take them seriously; it merely means that the spirit rather than the letter of the requirements governs."*Cook, 2004 WL 203111, at \*6.*

Here, Fedderwitz focuses on a variety of alleged procedural errors that he claims adversely affected his benefits determination. For example, Fedderwitz argues that a failure to "provide credentials for the medical professionals consulted in this case" negatively impacted his ability to participate in a full and fair review. (Fedderwitz's Summary Judgment Memorandum at 12.) The relevant regulations do not expressly provide for such an affirmative duty, and it is unclear that *29 C.F.R. § 2560.503-1* should be so construed. In any case, MetLife noted in its final denial that the review was conducted by "an Independent Physician Consultant, Board Certified in Occupational and Environmental Medicine," (Letter from Shelley Geary, Procedure Analyst, MetLife, to Attorney Patrick Busse, dated August 18, 2004, at 3), and has provided Fedderwitz with a copy of his claim file at various stages of his claim. The record demonstrates that Fedderwitz has been provided with information sufficient "to prepare adequately for further administrative review or an appeal to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)
(Cite as: 2007 WL 2846365 (S.D.N.Y.))

federal courts," *Juliano,* 221 F.3d at 287.

*11 Fedderwitz also alleges that MetLife continued to rely upon an incorrect job description in making its disability determination; the record demonstrates that MetLife acknowledged this error and that subsequent reviews were conducted in light of an accurate job description. And Fedderwitz contends that the fact that MetLife erroneously included a different claimant's information (because the document mistakenly had Fedderwitz's claim number) in his file, but did not include that document in the administrative file submitted to this Court, indicates that MetLife is intentionally withholding documents from him. Without more to substantiate the claim, it does not strike this Court as untoward or unreasonable that a document that initially was erroneously included in a file not be filed upon discovery of the error.

Notwithstanding any errors committed by MetLife, the record here demonstrates that MetLife has substantially complied with ERISA's requirements for a full and fair review, by providing Fedderwitz with an opportunity to submit information relating to his claim for benefits, providing him with copies of relevant documents, and providing an independent review in light of additional documentation submitted by him.

*C. MetLife's Counterclaim*

MetLife moves for summary judgment on its counterclaim, seeking recovery of an overpayment of LTD benefits due to Fedderwitz's receipt of SSDI benefits. Under 29 U.S.C. § 1132(a)(3), "[a] civil action may be brought ... by a ... fiduciary ... to obtain ... appropriate equitable relief." The Supreme Court recently held that an action by an ERISA fiduciary to recover specific property dedicated to a specified creditor as an offset to benefits paid was akin to an equitable lien and therefore permissible under 29 U.S.C. § 1132(a)(3).*See Sereboff v. Mid Atlantic Medical Services, Inc.,* 126 S.Ct. 1869, 1877-78 (2006). Here, similar to the circumstances in *Sereboff,* a specific res (the SSDI benefits) has been designated to a specific creditor (MetLife), and thus this action is permissible under ERISA.

Fedderwitz does not contest the fact that he signed an Agreement to Reimburse Overpayment of Long

Term Disability Benefits, nor that he has received SSDI benefits for the relevant period. In his response to Defendants' Local Rule 56.1 Statement, he disputed the amount due to MetLife, which MetLife contends is $4,827.07 for the relevant period; however, in Fedderwitz's Summary Judgment Memorandum, he failed to address MetLife's contentions at all. Although Fedderwitz has objected to the amount in a conclusory fashion, he has provided no computation of his own nor any meaningful opposition to MetLife's counterclaim. This Court therefore grants MetLife's motion for summary judgment in its favor on its counterclaim and accepts its calculations of the overpayment amount.

### III. CONCLUSION

For the reasons set forth above, defendants-counterclaimants' motion is GRANTED, Fedderwitz's motion is DENIED, and Fedderwitz's complaint is DISMISSED. The Clerk of the Court is directed to enter judgment on Defendants' behalf in the amount of $4,827.07 and to close this case.

*12 SO ORDERED.

S.D.N.Y.,2007.
Fedderwitz v. Metropolitan Life Ins. Co. Inc.'s Disability Unit
Slip Copy, 2007 WL 2846365 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    Via ECF

DONNA FEHN,

                    Plaintiff,          :    07 CIV. 8321 (WCC)

    -against-                :     :    AFFIDAVIT OF SERVICE

GROUP LONG TERM DISABILITY PLAN FOR
EMPLOYEES OF JP MORGAN CHASE BANK, JP    :
MORGAN CHASE BANK, as Plan Administrator,
HARTFORD LIFE AND ACCIDENT INSURANCE    :
COMPANY, as Administrator/Fiduciary of the Plan, KRISTA
DUDECK, Individually, DANIEL BERTA, Individually,    :
KARA MORETT, Individually, and DESMOND "Doe,"
Individually,    :

                   Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**STATE OF NEW YORK**    )
                      ) ss.:
**COUNTY OF NEW YORK**    )

    Marlene Thompson, being duly sworn, deposes and says, that deponent is not a party to the action, is over eighteen years of age and is employed by JPMorgan Chase Bank, N.A.

    That on the 15th day of July, 2008 deponent served the within:

**NOTICE OF MOTION FOR RECONSIDERATION**

**JPMORGAN CHASE'S MEMORANDUM OF LAW IN SUPPORT**

**OF ITS MOTION FOR RECONSIDERATION**

To:    Danie T. Driesen, Esq.                Michael Bernstein, Esq.
        **Sapir & Frumkin LLP**              **Sedgwick, Detert, Moran & Arnold, LLP**
        Attorneys for Plaintiff             Attorneys for Defendant Hartford
        399 Knollwood Road, Suite 310       125 Broad Street, 39th Floor
        White Plains, New York 10603       New York, New York 10004-2400
        DDriesen@sapirfrumkin.com        Michael.Bernstein@sdma.com

by the address designated for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

Sworn to before me this
15 day of July, 2008

_____
Notary Public

STUART RADISH
Notary Public, State of New York
No. 01RA6115435
Qualified in New York County
Commission Expires September 7, 2008

163621:v1