Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 1 of 9

Page 1
2007 U.S. Dist. LEXIS 72702, *

1 of 1 DOCUMENT

**RONALD FEDDERWITZ, Plaintiff, Counterclaim-Defendant, -v- METROPOLITAN LIFE INSURANCE COMPANY INC.'S DISABILITY UNIT, as Claims Administrator, PHILIPS ELECTRONICS NORTH AMERICA CORPORATION GROUP WELFARE BENEFIT PLAN, and ERISA ADMINISTRATION COMMITTEE, as Plan Administrator, Defendants, Counterclaim-Plaintiffs.**

**05 CV 10193 (BSJ) (HP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 72702*

**September 21, 2007, Decided
September 27, 2007, Filed**

**COUNSEL:** [*1] For Jose Blaze Cruz, Petitioner: James A. Cohen, LEAD ATTORNEY, Lincoln Sq. Legal Services, New York, NY.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

*MEMORANDUM & ORDER*

Plaintiff-Counterclaim-Defendant Ronald Fedderwitz ("Fedderwitz") brought this action against Metropolitan Life Insurance Company ("MetLife") (sued herein incorrectly as "Metropolitan Life Insurance Company Inc.'s Disability Unit"), Philips Electronics North America Corporation ("Philips") Group Welfare Benefit Plan, and ERISA Administration Committee, as Plan Administrator, alleging that defendants wrongfully denied him long-term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001 et seq.* Defendants counterclaimed, seeking the repayment of an alleged overpayment of benefits resulting from Fedderwitz's receipt of Social Security Disability Insurance ("SSDI") [*2] attributable to the same period for which he received LTD benefit payments. Pending before the Court are cross-motions for summary judgment. For the following reasons, defendants-counterclaimants' motion is GRANTED, Fedderwitz's motion is DENIED, and Fedderwitz's complaint is DISMISSED.

**I. BACKGROUND**

The following facts are undisputed, except where otherwise noted.

From October, 1989 through February 10, 2003, Fedderwitz worked for Philips as a "Senior Electronic Technician," whose job responsibilities included, among other things, [1] "covering job si[tes] in: N.Y.C., upstate N.Y., parts of Long Island & Connecticut[,] [d]ismantling [n]uclear cameras for repairs, maintenance, relocation & handling parts up to and including 300 lb. lead plates." (Long Term Disability Claim Form of Ronald Fedderwitz dated Sept. 2, 2003 ("Fedderwitz LTD Claim Form").)

[1] The parties dispute Fedderwitz's title and the precise scope of his job duties. *See, e.g.,* Pl.'s *Local Rule 56.1* Statement PP 24-25; Defs.' Response to Pl.'s *Local Rule 56.1* Statement PP 24-25.

As a regular, full-time employee, Fedderwitz was covered by Philips's Long Term Disability Program (the "Plan"); MetLife serves as both the Plan's insurer [*3] and claims administrator. The Summary Plan Description ("SPD") provides the following definition of "disability" pertinent to this action:

> For the first 2 1/2 years, you will be considered disabled if you are unable to earn more than 80% of your indexed pre-disability earnings at your own occupation for any employer in your local economy. After 2 1/2 years, you will be considered disabled if you are unable to earn more than 65% of your indexed pre-disability earnings from any employer, at any occupation for which you are reasonably qualified, taking into account your training,

Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 2 of 9

Page 2
2007 U.S. Dist. LEXIS 72702, *

> education, experience and pre-disability earnings.

(SPD at 8.) Any LTD benefits disbursed upon a finding of disability were to "be reduced by the amount [the claimant is] entitled to receive from Social Security whether or not [the claimant is] receiving benefits." *(Id.* at 13.) Further, the SPD provides that "[i]f [the claimant's] application to Social Security is pending when [he] begin[s] receiving benefits under the plan, [the claimant] must sign a reimbursement agreement with the plan so that an estimate of the amount [the claimant] will be receiving from Social Security is not deducted from [the claimant's] [*4] plan payments." *(Id.)*

With respect to the disability determination and Plan interpretation, the Plan grants MetLife

> the exclusive right, power, and authority in its sole and absolute discretion to administer, apply and interpret the plan and any other plan documents, and to determine eligibility for and entitlement to plan benefits and to decide all matters arising in connection with the operation or administration of the plan.

*(Id.* at 15.) To determine whether a claimant is disabled under the Plan, "MetLife must have satisfactory evidence that [the claimant is] totally disabled." *(Id.* at 7.)

On February 11, 2003, Fedderwitz underwent surgery to replace his right knee, which was afflicted with osteoarthritis and atrophied due to injuries suffered as a child. *(See* Fedderwitz LTD Claim Form at 1; Fedderwitz Attending Physician Statement dated Sept. 12, 2003 ("Fedderwitz First APS"), at 1.) Following his surgery, Fedderwitz timely filed for Short Term Disability benefits, and received benefits for the full period of his eligibility, February 10, 2003 through August 10, 2003. (Pl.'s Local Rule 56.1 Statement P 41.) He also timely filed for LTD benefits on or about September 2, 2003. *(Id.* P 42.)

In [*5] his initial claim, Fedderwitz stated that the replacement of his right knee "prevent[ed him] from performing the duties of [his] job," and noted that the surgery affected his ability to "stand[], walk[], stoop[], [and] lift[]." (Fedderwitz LTD Claim Form Employee Statement.) As a part of his claim, Fedderwitz also provided MetLife with a list of all physicians who had treated him within the past two years, and a signed release authorizing the disclosure of medical information relevant to the disability claim. In a letter dated September 15, 2003, a case manager at MetLife informed Fedderwitz that "the information provided is insufficient to establish a total disability as defined by [the Plan]," and requested from Fedderwitz copies of office notes from all his treating physicians, as well as a completed Attending Physician Statement ("APS"). (Letter from Tina Conover, Case Management Specialist, to Ronald V. Fedderwitz, dated Sept. 15, 2003.)

Per MetLife's request, Fedderwitz submitted an APS (and accompanying report) from Dr. Richard Legouri, his orthopedic surgeon, as well as treatment notes from physical therapy sessions. Dr. Legouri asserted that Fedderwitz was "[t]otally disabled [*6] through reevaluation on 10/30/03," noting that Fedderwitz "lacks full range of motion, right knee. Limited standing/walking, no climbing, squatting or bending." (Fedderwitz First APS.) Assessing Fedderwitz's physical capabilities, Dr. Legouri stated that Fedderwitz was able to operate a motor vehicle, frequently lift or carry up to 20 pounds, and occasionally lift or carry up to 50 pounds. *(Id.)* The notes from a May 19, 2003 physical therapy session indicated that Fedderwitz "reports dull ache patellar region with knee extension but overall is pleased with his improved mobility and overall function." (Fedderwitz Physical Therapy Progress Report dated May 19, 2003.) According to these notes, Fedderwitz was also able to support his weight using only his right leg while on a trampoline for over 30 seconds, was "[i]ndependent without assistive device on all terrains with significant antalgia," and "made significant improvement in all parameters of therapy: [range of motion], strength, ambulatory status and function." *(Id.)* A subsequent physical therapy progress report from August 16, 2003 repeated Fedderwitz's satisfaction with "his improved mobility and overall function." (Fedderwitz [*7] Physical Therapy Progress Report dated Aug. 16, 2003.) MetLife also requested and received from Philips what was later discovered to be an inaccurate statement of Fedderwitz's job description; [2] MetLife relied upon this description in making its initial determination regarding Fedderwitz's LTD claim.

> 2   This job description was for a job that was largely sedentary and less physically demanding than Fedderwitz's job; MetLife ultimately received an accurate description.

Based on the information provided, on or around September 25, 2003, MetLife approved LTD benefits through October 30, 2003. (Diary Review - Report for Ronald Fedderwitz at 5.) In early October, Fedderwitz signed and submitted an Agreement to Reimburse Overpayment of Long Term Disability Benefits; this Agreement required Fedderwitz to apply for SSDI benefits, to inform MetLife of any award, and to reimburse MetLife for the difference between MetLife's LTD benefit payment and any SSDI benefits he received. Additionally, in further support of Fedderwitz's claim, Dr. Legouri submitted

Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 3 of 9

Page 3
2007 U.S. Dist. LEXIS 72702, *

another APS dated October 30, 2003, in which he noted that Fedderwitz still had trouble standing, walking, climbing, and squatting. (Fedderwitz [*8] Attending Physician Statement dated Oct. 30, 2003 ("Fedderwitz Second APS").) Dr. Legouri also submitted a copy of his treatment notes; an entry dated October 30, 2003 stated that "[Fedderwitz] is doing much better. He has approximately the same range of motion he had preoperatively except that he has less pain."

In a letter dated December 1, 2003, MetLife declined to extend Fedderwitz's LTD benefits beyond October 30, 2003. Citing the records submitted by Fedderwitz and referring to the erroneous job description, MetLife noted that

> [t]he restrictions and limitations provided by Dr. Legouri on the Attending Physician Statement would not prevent you from working within your own job demands. The physical therapy notes show overall improvement in strength and range of motion. You are able to ambulate independently on all terrain without assistive devices. The October 30, 2003 office visit note indicates you are doing much better, you have less pain, and you were to continue with activities as tolerated and follow-up in three months. You do not appear to be in the acute phase of recovery based upon the medical information submitted. There is no evidence that you have side effects from medication [*9] or that medications would prevent you from returning to work. There is no indication you require a referral to other specialists such as pain management or physical medicine and rehabilitation. As the medical information provided no longer supports a severity of your condition that would prevent you from working at your regular job, your claim for long-term disability benefits has been terminated effective October 31, 2003.

(Letter from Tina M. Conover, Case Management Specialist, to Ronald Fedderwitz, dated Dec. 1, 2003, at 2.) Within a few days, Fedderwitz's wife and a union representative telephoned MetLife to inform it that it had relied on an inaccurate job description in making its disability determination. (Pl.'s Local Rule 56.1 Statement P 51; Diary Review - Report for Ronald Fedderwitz at 13.) MetLife confirmed the error, and received an accurate job description from Philips shortly thereafter. (Pl.'s Local Rule 56.1 Statement P 56.)

After receiving this description, MetLife had Fedderwitz's file reviewed in light of the accurate job description by Dr. John Thomas, an independent physician. (Diary Review - Report for Ronald Fedderwitz at 15.) According to MetLife's internal [*10] documentation of this review, Dr. Thomas's impressions were that Fedderwitz "may never have had [a] normal [range of motion]" in his right leg due to the burns and scarring he had suffered as a child; Thomas also noted that Fedderwitz was "able to function in [his] job essential duties w/ this condition prior to" the knee replacement surgery. (*Id.*) Additionally, Dr. Thomas remarked that

> notes show that [Fedderwitz] has improved condition compared w/pre-op. [Attending Physician] notes 10/30/03 [Fedderwitz] doing much better, . . . has approx[imately] same [range of motion] as he had pre-op except that he has less pain . . . . [Fedderwitz] appears improved from pre-op . . . able to function in own job duties.
>
> Appears own job would allow [Fedderwitz] to change positions as needed, own job does not require constant kneeling, etc. that would not allow for change of positions.

(*Id.*) Thomas thus concluded that "medical does not appear to support that [Fedderwitz] unable to function in own occ[upational] duties past . . . 10/30/03." (*Id.*)

Through a letter from his attorney dated February 4, 2004, Fedderwitz notified MetLife of his intent to appeal MetLife's determination, and requested a copy [*11] of his claim file; MetLife provided him with a copy of the file on or around February 18, 2004. By a letter dated July 7, 2004, Fedderwitz requested that MetLife "treat this letter and the enclosed medical documentation as Mr. Fedderwitz's appeal of Met[L]ife's decision to terminate his's [sic] long term disability benefits." (Letter from Patrick Busse, Binder & Binder, PC, to Thomas Balfe, Metropolitan Life Insurance Co., dated July 7, 2004, at 1.) Along with additional documentation from Dr. Legouri, Fedderwitz supplemented his initial claim documents with letters and reports from Dr. Mitchell Saunders, his treating cardiologist; Dr. Lee Shangold, his otolaryngologist; Dr. Paul Bohensky, his pulmonologist; and Dr. Thomas Spinnato, his primary care physician. In this letter, Fedderwitz also noted that he "successfully obtained Social Security Disability based upon his various medical conditions." (*Id.* at 10.)

The evidence submitted for Fedderwitz's appeal

Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 4 of 9

Page 4
2007 U.S. Dist. LEXIS 72702, *

included the following. In a letter dated March 18, 2004, Dr. Legouri wrote that Fedderwitz had recently suffered an injury to his left knee that might require surgery. However, Legouri also noted that Fedderwitz's right knee was "doing [*12] well," and that there was "no real pain throughout range of motion." (Letter from Richard A. Legouri, M.D., to Thomas Spinnato, M.D., dated March. 18, 2004, at 1.)

Dr. Saunders reported in a letter dated October 15, 2003, that Fedderwitz "[p]ostoperatively . . . had trouble with respiratory problems and hypoventilation, possibly related to morphine [and] had incidences of night sweats, which seem to be resolving." (Letter from Mitchell A. Saunders, M.D., to Thomas Spinnato, M.D., dated Oct. 15, 2003 ("Saunders October Letter"), at 1.) The results of a June, 2003 echocardiogram were described as "reveal[ing] mildly dilated left atrium at 4.3 cm, mild pulmonary hypertension with an RVSP of 44mmHg, trace aortic insufficiency and mitral and tricuspid regurgitation." *(Id.)* Saunders further noted that "[Fedderwitz] states that he gets very physically exhausted with moderate activity. He cannot even raise his arms above his head without losing his breath and feeling fatigued very quickly." *(Id.* at 2.) After assessing Fedderwitz's other conditions and his medications, Dr. Saunders concluded that "[a]t this time, [Fedderwitz] does not appear to have the physical ability to return to work as [*13] a nuclear technician repairman." *(Id.)*

Dr. Saunders wrote up the results of Fedderwitz's follow-up visit in a letter dated February 27, 2004. In this letter, Dr. Saunders noted that

> [Fedderwitz] presents today for follow up evaluation and reports that overall he is feeling well from a cardiac standpoint. He also reports feeling significant improvement in his edema, weakness and fatigue since switching to atenolol. He does report, however, that he has been somewhat noncompliant with regard to his diet and has had elevated blood sugars and lipid levels. He denies any chest pain, exertional chest discomfort, shortness of breath, lightheadedness, dizziness, syncope, near syncope, palpitations, PND, orthopnea, or peripheral edema.
>
> . . . .
>
> Physical examination reveals a well-developed, well-nourished male, alert and oriented, in no acute distress with good skin color and turgor. Cardiac examination reveals normal S1, S2 with no murmurs, rubs, gallops or clicks. . . .
>
> Resting electrocardiogram performed today demonstrates normal sinus rhythm, right bundle branch block pattern which is noted on prior tracings.
>
> In summary, this is a 63-year-old male with a history of paroxysmal atrial fibrillation [*14] and hypertension which both appear to be well controlled on his current regimen of atenolol and Norvasc.

(Letter from Mitchell A. Saunders, M.D., to Thomas Spinnato, M.D., dated Feb. 27, 2004 ("Saunders February Letter"), at 1-2.) And in contrast to his earlier letter, here, Dr. Saunders made no assessment regarding Fedderwitz's disability status.

Fedderwitz's pulmonologist, Dr. Bohensky, submitted a letter dated November 18, 2003, in which he noted that he had been treating Fedderwitz for the past six years due to his chronic lung disease. As a result of this condition, Dr. Bohensky stated that "[Fedderwitz] becomes short of breath easily upon mild exertion. . . . [His] abnormality results in a predisposition to respiratory infections for which he needs recurrent treatment." (Letter from Paul Bohensky, M.D., to Charles E. Binder, Binder and Binder, dated Nov. 18, 2003.) Dr. Bohensky also noted that "Mr. Fedderwitz also has other multiple medical problems including diabetes, hypertension, asthma, atherosclerotic heart disease, status-post bypass surgery, seizure disorder, and status-post severe burns to his body." *(Id.)* He concluded by asserting that "Mr. Fedderwitz is significantly [*15] limited and is essentially disabled at this time. This is most likely permanent." *(Id.)*

MetLife sent the complete file to another independent physician, Dr. John Olmstead, who conducted a review of the claim. In his report, Dr. Olmstead summarized the medical documentation in the file, along with impressions of some of the evidence provided. Dr. Olmstead assessed Fedderwitz's knee condition as follows:

> In a disability note, Dr. Legouri describes him as totally disabled until 1/22/04 pending re-evaluation. This is inconsistent, and total disability because of the knee surgery, is not supported by objective medical information in the file. In fact, he describes his capabilities differently. In his [office visit notes], Dr. Legouri states [Fedderwitz] is doing much better, has [range of motion] nearly the same as preoperatively, with less pain. Activity is as tolerated. PT notes in the file support improving motility and as early as 5/18/03, the patient is able to stand on one leg on a trampoline for more than 30 seconds, and is

Case 7:07-cv-08321-WCC    Document 29-3    Filed 07/29/2008    Page 5 of 9

Page 5
2007 U.S. Dist. LEXIS 72702, *

> ambulatory on any terrain without assistive devices.

(Fedderwitz Physician Consultant Review at 4.) Dr. Olmstead then turned to Fedderwitz's physical restrictions **[*16]** in light of the job description, noting that

> [Fedderwitz] submits what is purported to be his correct job description and indeed, he does quite heavy work. He also must occasionally work in awkward positions as well as needing to be quite flexible. Work on ladders, or scaffolding would be inappropriate with his limitations. He has potential exposure to toxic fumes from which he needs to avoid exposure.

*(Id.)* Because of the potential exposure to fumes, Dr. Olmstead next considered Fedderwitz's respiratory condition:

> The ability to wear a respirator in this regard is not addressed. He is described as having a chronic restrictive lung disease. There is no pulmonary function testing in the file. It is unclear from the record what may have changed from the time when he last worked that he now requires these restrictions. There is no documentation of ongoing medical severity, frequency, severity, and duration of symptoms despite treatment. He would be predisposed to respiratory infections whether he is at work or not, which does not support an impairment to his job.

*(Id.)* The report characterized the evidence regarding Fedderwitz's cardiac status as follows:

> Dr[.] Saunders, cardiologist, feels **[*17]** the atrial fibrillation is well controlled with the current medications. His high blood pressure is likewise under good control. His blood sugars and lipids are not in good control and this is due to lack of patient compliance. Concerns about his previous [myocardial infarction] and by-pass grafts are not raised by the cardiologist. In the absence of any information to the contrary, the coronary status is presumed to be good and would not be an impairment to work. There is no record of a current treadmill test.

*(Id.)* Dr. Olmstead also considered the other medical conditions that Fedderwitz first brought up on his appeal, asserting that

> [Fedderwitz's] age is not an impairment to work. The prior history of the 3rd degree burns is not impairment. He has been working his whole life with this, and there is no documentation supporting this as a disability. Diabetes and lipids have been out of control but latest labs show dramatic improvement, quite likely because claimant is currently paying attention to his diet. This is not an impairment to work. His thyroid disease has been controlled by surgery and medication and is not impairment.

*(Id.)* Dr. Olmstead distilled his concerns about the appeal **[*18]** as follows: "The question is whether this person can do the heavy work of a nuclear tech. The main difficulty with this file is an absence of objective medical documentation of a functional impairment to work due to respiratory, cardiac, or knee function." *(Id.)*

In a letter dated August 18, 2004, MetLife notified Fedderwitz that the decision to terminate benefits past October 30, 2003 was upheld on review, and provided as an explanation for its decision a condensed version of Dr. Olmstead's report. This action followed.

## II. DISCUSSION

A. *Applicable Standards*

1. *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* **[*19]** (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))*. Summary judgment is inappropriate if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)*. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 6 of 9

Page 6
2007 U.S. Dist. LEXIS 72702, *

motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202, (1986).*

2. *Standard of Review for a Denial of Benefits Under ERISA*

"[A] denial of benefits challenged under *§ 1132(a)(1)(B)* is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999)* (quoting *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).* "Where a plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, [*20] and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler, 181 F.3d at 249* (quoting *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995))* (citation and quotation omitted). "This scope of review is narrow, thus [the Court is] not free to substitute [its] own judgment for that of the [plan administrator] as if [the Court] were considering the issue of eligibility anew." *Pagan, 52 F.3d at 442*.

An allegation that the plan administrator operated under a conflict of interest is insufficient by itself to change the standard of review; rather, "[i]n order to trigger *de novo* review of an administrator's decision when the plan itself grants discretion to the administrator, a plaintiff must show that 'the administrator was *in fact* influenced by the conflict of interest.'" *Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000)* (quoting *Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1256 (2d Cir. 1996))* (emphasis in *Pulvers).* "[T]he burden of proving that the conflict of interest affected the administrator's decision rests with the plaintiff[]." *Sullivan, 82 F.3d at 1259*. "The fact [*21] that [an entity] served as both plan administrator and plan insurer, although a factor to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review." *Pulvers, 210 F.3d at 92* (internal quotations and citation omitted).

Here, the Plan language unmistakably grants MetLife discretionary authority to determine eligibility for benefits. Nevertheless, Fedderwitz contends that the Court should conduct a more stringent *de novo* review of the decision to deny LTD benefits because MetLife "operated under a conflict of interest." (Pl.'s Memorandum of Law in Support of His Motion for Summary Judgment and in Opposition to Def.'s Motion for Summary Judg[]ment ("Fedderwitz's Summary Judgment Memorandum"), at 10.) Fedderwitz's only support for this allegation is the conclusory assertion that "[t]here can be no other reason for Metlife's dogged pursual of Mr. Fedderwitz' termination in the face of such clear and convincing evidence of his disability, and also of Met[L]ife's error in using the wrong job description." *(Id.)* This assertion by itself is insufficient to alter the standard of review, and thus the Court will review [*22] the decision to deny Fedderwitz LTD benefits under the arbitrary and capricious standard.

B. *Review of the Decision to Deny LTD Benefits*

In this action, Fedderwitz claims that MetLife's decision to deny LTD benefits was arbitrary and capricious because MetLife "ignored reliable evidence of Mr. Fedderwitz's disability and, instead, relied upon inherently unreliable 'medical' evidence created by its own 'paid for' consultant"; "intentionally skewed the results of its internal medical and vocational reviews to support its decision to deny benefits by ignoring the error in the job descriptions"; "improperly imposed additional substantive requirements on Mr. Fedderwitz which do not appear in the SPD or the group insurance policy" by discounting medical conclusions not supported by objective medical documentation; and "denied [Fedderwitz] a full and fair review by intentionally withholding the reviewing physicians' credentials and name[s] during the review process." (Fedderwitz's Summary Judgment Memorandum at 11.)

Contrary to Fedderwitz's claims, the record before this Court, even with all reasonable inferences drawn in Fedderwitz's favor, does not support the conclusion that MetLife's decision [*23] to deny LTD benefits was arbitrary and capricious. Indeed, Fedderwitz's characterization of MetLife's actions is not borne out by the record.

1. *Fedderwitz's Challenges to the Decision*

With respect to MetLife's consideration of Fedderwitz's medical documentation, it was not unreasonable or arbitrary and capricious for MetLife to discount the statements of Fedderwitz's treating physicians in light of the contradictory evidence presented by the reports. For example, although Dr. Legouri asserted in mid-September, 2003 that Fedderwitz was completely disabled, the doctor's treatment notes from October, 2003 noted that Fedderwitz "has approximately the same range of motion he had preoperatively *except that he has less pain."* (Treatment Notes of Dr. Legouri (emphasis added).) Similarly, while Dr. Saunders concluded in October, 2003 that "[Fedderwitz] does not appear to have the physical ability to return to work as a nuclear technician repairman," (Saunders October Letter at 2), a subsequent letter presented a significantly improved cardiac status and was notably silent with respect to Fedderwitz's disability status, *(see* Saunders February Letter). The claim file shows that

MetLife's reviewing [*24] physicians considered this evidence, along with other factors, in denying Fedderwitz's claim. This Court cannot say that this evidence-largely provided by Fedderwitz himself--is not substantial evidence in support of MetLife's decision.

Fedderwitz emphasizes that MetLife should have accorded more weight to the opinions of his treating physicians, arguing that "it was arbitrary and capricious for Met[L]ife to give greater and controlling weight to the opinions of its employees over that of Mr. Fedderwitz's treating, board certified orthopedic surgeons, board certified internists, board certified cardiologists, board certified pulmonologist, and his primary care physician--all of which [sic] have examined him countless times." (Fedderwitz's Summary Judgment Memorandum at 21.) However, as Fedderwitz acknowledges, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)*. Still, although plan administrators are not required to defer to treating physicians, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." [*25] *Id. at 834*. Here, the record shows that MetLife relied largely on what it found to be internal contradictions in Fedderwitz's own evidence in declining to credit the disability conclusions of Fedderwitz's treating physicians, and this Court cannot say that such refusal was arbitrary.

Additionally, Fedderwitz claims that MetLife's reviewers failed to adequately consider the cumulative impact of all of his medical conditions vis-a-vis his disability claim; again, the record shows otherwise. Dr. Olmstead expressly took into account Fedderwitz's numerous chronic conditions, most of which had manifested prior to Fedderwitz's asserted disability, noting that the medical evidence provided suggested that the conditions were under control, and that in some cases, Fedderwitz had been able to perform in his job despite them. *(See* Fedderwitz Physician Consultant Review at 4.) In light of these factors, it was not unreasonable for MetLife to decline to then consider the cumulative impact of Fedderwitz's chronic, mostly preexisting conditions in conjunction with his knee condition.

Fedderwitz also contends that MetLife's skepticism of some of Fedderwitz's physicians' subjective claims in the absence [*26] of objective medical documentation violated the terms of the Plan, by "essentially adding new terms to the LTD Plan," to wit, an objective evidence requirement. (Fedderwitz's Summary Judgment Memorandum at 22.) This argument is unavailing. First, the terms of the Plan expressly require "satisfactory evidence" of a disability; it is not an unreasonable interpretation of that provision to require objective medical evidence to support subjective claims. And as a general matter, courts in this Circuit have declined to find unreasonable a decision to favor objective over subjective medical evidence. *See, e.g., Graham v. First Reliance Standard Life Ins. Co., No. 04 Civ. 9797 (NRB), 2007 U.S. Dist. LEXIS 55324, 2007 WL 2192399, at *9 (S.D.N.Y. July 31, 2007)* ("First Reliance's decision to credit objective over subjective evidence was not unreasonable or illegitimate."); *Couture v. UNUM Provident Corp., 315 F. Supp. 2d 418, 432 (S.D.N.Y. 2004)* ("It is not unreasonable for an insurer to credit objective evidence over subjective evidence.").

2. *Fedderwitz's "Full and Fair Review" Claim*

Finally, Fedderwitz argues that he was denied a full and fair review as required by ERISA due to various alleged errors committed throughout [*27] the review process, including MetLife's reliance on an incorrect job description, a failure to provide Fedderwitz with the requested credentials of reviewing physicians, and other procedural errors. This argument is also unavailing.

Under ERISA, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *29 U.S.C. § 1133(2)*. Regulations issued by the Department of Labor further provide in pertinent part that

> the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; . . . [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. . . .; [and p]rovide for a review that takes into account all comments, [*28] documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

*29 C.F.R. § 2560.503-1(h)(2)(ii)-(iv)*. The purpose of this review is to "provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. . . . [and to] enable the member

Case 7:07-cv-08321-WCC   Document 29-3   Filed 07/29/2008   Page 8 of 9

Page 8
2007 U.S. Dist. LEXIS 72702, *

effectively to protest that decision." *Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000)*. In essence, the full and fair review requirement exists "to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Id.* (internal quotations omitted).

The Second Circuit has indicated that a full and fair review occurs where a plan administrator has substantially complied with ERISA's procedural requirements, *see Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 107 (2d Cir. 2003)*, and district courts in this Circuit have adopted this standard, *see, e.g., Cook v. New York Times Co. Long-Term Disability Plan, No. 02 Civ. 9154 (GEL), 2004 U.S. Dist. LEXIS 1259, 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30 2004)*; [*29] *Diagnostic Medical Associates, M.D., P.C. v. Guardian Life Ins. Co., 157 F. Supp. 2d 292, 299 (S.D.N.Y. 2001)*. "The more flexible application of these regulatory requirements does not indicate that courts do not take them seriously; it merely means that the spirit rather than the letter of the requirements governs." *Cook, 2004 U.S. Dist. LEXIS 1259, 2004 WL 203111, at *6.*

Here, Fedderwitz focuses on a variety of alleged procedural errors that he claims adversely affected his benefits determination. For example, Fedderwitz argues that a failure to "provide credentials for the medical professionals consulted in this case" negatively impacted his ability to participate in a full and fair review. (Fedderwitz's Summary Judgment Memorandum at 12.) The relevant regulations do not expressly provide for such an affirmative duty, and it is unclear that *29 C.F.R. § 2560.503-1* should be so construed. In any case, MetLife noted in its final denial that the review was conducted by "an Independent Physician Consultant, Board Certified in Occupational and Environmental Medicine," (Letter from Shelley Geary, Procedure Analyst, MetLife, to Attorney Patrick Busse, dated August 18, 2004, at 3), and has provided Fedderwitz with a [*30] copy of his claim file at various stages of his claim. The record demonstrates that Fedderwitz has been provided with information sufficient "to prepare adequately for further administrative review or an appeal to the federal courts," *Juliano, 221 F.3d at 287*.

Fedderwitz also alleges that MetLife continued to rely upon an incorrect job description in making its disability determination; the record demonstrates that MetLife acknowledged this error and that subsequent reviews were conducted in light of an accurate job description. And Fedderwitz contends that the fact that MetLife erroneously included a different claimant's information (because the document mistakenly had Fedderwitz's claim number) in his file, but did not include that document in the administrative file submitted to this Court, indicates that MetLife is intentionally withholding documents from him. Without more to substantiate the claim, it does not strike this Court as untoward or unreasonable that a document that initially was erroneously included in a file not be filed upon discovery of the error.

Notwithstanding any errors committed by MetLife, the record here demonstrates that MetLife has substantially complied with [*31] ERISA's requirements for a full and fair review, by providing Fedderwitz with an opportunity to submit information relating to his claim for benefits, providing him with copies of relevant documents, and providing an independent review in light of additional documentation submitted by him.

C. *MetLife's Counterclaim*

MetLife moves for summary judgment on its counterclaim, seeking recovery of an overpayment of LTD benefits due to Fedderwitz's receipt of SSDI benefits. Under *29 U.S.C. § 1132(a)(3)*, "[a] civil action may be brought . . . by a . . . fiduciary . . . to obtain . . . appropriate equitable relief." The Supreme Court recently held that an action by an ERISA fiduciary to recover specific property dedicated to a specified creditor as an offset to benefits paid was akin to an equitable lien and therefore permissible under *29 U.S.C. § 1132(a)(3)*. See *Sereboff v. Mid Atlantic Medical Services, Inc., 547 U.S. 356, 126 S. Ct. 1869, 1877-78, 164 L. Ed. 2d 612 (2006)*. Here, similar to the circumstances in *Sereboff,* a specific res (the SSDI benefits) has been designated to a specific creditor (MetLife), and thus this action is permissible under ERISA.

Fedderwitz does not contest the fact that he signed an Agreement to Reimburse [*32] Overpayment of Long Term Disability Benefits, nor that he has received SSDI benefits for the relevant period. In his response to Defendants' Local Rule 56.1 Statement, he disputed the amount due to MetLife, which MetLife contends is $ 4,827.07 for the relevant period; however, in Fedderwitz's Summary Judgment Memorandum, he failed to address MetLife's contentions at all. Although Fedderwitz has objected to the amount in a conclusory fashion, he has provided no computation of his own nor any meaningful opposition to MetLife's counterclaim. This Court therefore grants MetLife's motion for summary judgment in its favor on its counterclaim and accepts its calculations of the overpayment amount.

### III. CONCLUSION

For the reasons set forth above, defendants-counterclaimants' motion is GRANTED, Fedderwitz's motion is DENIED, and Fedderwitz's complaint is DISMISSED. The Clerk of the Court is directed to enter judgment on Defendants' behalf in the amount of $ 4,827.07 and to close this case.

2007 U.S. Dist. LEXIS 72702, *

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York

September 21, 2007